[No. D005176. Fourth Dist., Div. One. Sept. 25, 1987.]

COX CABLE SAN DIEGO, INC., Plaintiff and Appellant, v. HENRY BOOKSPAN et al., Defendants and Respondents.

COUNSEL

Ferris, Brennan & Britton, Christopher Q. Britton and Stacy L. Howells for Plaintiff and Appellant.

Darvey Mack Cohan for Defendants and Respondents.

OPINION

**KREMER, P. J.**—Cox Cable San Diego, Inc. (Cox) appeals an order denying a preliminary injunction to allow Cox to reconnect subscribers at the

Woodlawn Garden Apartments (Woodlawn) pending a resolution of a dispute with Henry Bookspan, Woodlawn's owner, and Ultronics, Inc. Bookspan had disconnected Cox's cable television system at Woodlawn in favor of a satellite system from Ultronics, Inc. Cox contends Bookspan may not deny Cox access to Woodlawn's tenants without offending the First Amendment. We conclude Cox does not have a constitutionally compelled right of access to the tenants and that the trial court did not abuse its discretion in denying the preliminary injunction.

FACTS

Woodlawn is a 150-unit apartment complex consisting of 16 buildings. In November 1966, Cox's predecessor (Mission Cable Television) contracted with Woodlawn's owner (Bookspan's predecessor) to provide cable television services (CATV). The initial installation and service agreement provided Cox would install the necessary coaxial cables and outlets and the owner would pay for the actual costs of installation as well as a monthly service charge for the cable outlets. The contract was renewed and expanded in 1968 and 1978. Each contract gave Cox a right of access to perform necessary installation and maintenance. The 1978 contract provided Cox had a right of access to solicit subscribers and would, in all cases, deal directly with the tenants. The 1978 contract also provided the owner would prohibit exterior and master antennas for television reception and Cox could, if the owner violated this condition, terminate its CATV service and remove its equipment, require the owner to reimburse Cox for the actual installation costs in servicing Woodlawn's units and/or charge the owner a continuing monthly subscription rate for the affected units.

Some time later, Bookspan bought Woodlawn. In January 1986, Bookspan decided to install a satellite master antenna television system (SMATV) to provide cable television services to his tenants. He entered into a contract with Ultronics, Inc. for this system. He agreed to give Ultronics an exclusive easement to enter the premises to install, improve, replace, maintain or remove its equipment. On April 25, 1986, Bookspan informed Cox of his decision and requested Cox remove its equipment from Woodlawn. Cox refused, citing the contract with Bookspan's predecessor.

Installation of the Ultronics system began in March 1986 and was completed during the first week of May. It cost $54,000 to install the system. Bookspan had to obtain a zoning variance before installation.

On May 9, 1986, Bookspan authorized Ultronics to disconnect Cox's CATV system and to connect Ultronics' SMATV system. In response to subscriber complaints, Cox reconnected some of its subscribers at

Woodlawn. On May 19, Bookspan demanded Cox disconnect all service at Woodlawn within three days. When Cox did not comply, Bookspan sent Cox a copy of his letter to Ultronics authorizing Ultronics "to disconnect and remove all cable television equipment owned by Cox Cable."

On June 10, 1986, Cox filed an action in superior court for a temporary restraining order and preliminary injunction. Cox was granted a temporary restraining order enjoining Bookspan and Ultronics from interfering with Cox's reconnection of subscribers at Woodlawn.[1] During this period Cox reconnected about a dozen subscribers at two of Woodlawn's sixteen buildings.

Cox's motion for a preliminary injunction was heard on June 22, 1986. The trial court denied the injunction, finding Cox had an adequate remedy at law for damages, the contract with Woodlawn's predecessor was ambiguous and Cox had not sustained its burden of showing Cox was likely to prevail on the merits. Cox motioned for reconsideration. On August 29, 1986, the trial court denied Cox's motion, reiterating the same grounds. At both hearings, Cox argued it was entitled to the preliminary injunction under the First Amendment.

## DISCUSSION

### I

An order for a preliminary injunction is based on a showing that it is desirable to maintain the status quo pending a determination of the merits. (See *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 528 [67 Cal.Rptr. 761, 439 P.2d 889].) When deciding whether to issue a preliminary injunction, the trial court must evaluate two interrelated factors: "The first is the likelihood that the plaintiff will prevail on the merits at trial. The second is the interim harm that the plaintiff is likely to sustain if the injunction were denied as compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued.' [Citations.]" (*Langford* v. *Superior Court* (1987) 43 Cal.3d 21, 28 [233 Cal.Rptr. 387, 729 P.2d 822].) A trial court's decision to deny provisional relief is discretionary and will not be reversed if it is supported by sufficient evidence. (*Ibid.*; *Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

Cox argues that we should not use the usual substantial evidence standard of review but should conduct a de novo review because the First

---

[1] Reconnection of Cox's system did not involve merely splicing wires since Ultronics and Bookspan had dismantled Cox's distribution system.

Amendment is implicated and because there is no substantial factual dispute here. As our discussion will reveal, we need not rely on the substantial evidence rule to support the denial of the preliminary injunction here since we conclude, as a matter of law, Cox has no First Amendment right of access.[2]

## II

Cox argues the cable television medium is entitled to the same constitutional protection which is accorded the print medium and that denying Cox access to Woodlawn is an unjustified prior restraint of speech and censorship and is a discriminatory regulation of speech in absence of a compelling interest and in disregard of other, less restrictive means.

Cable television is entitled to some First Amendment protection (see *Los Angeles* v. *Preferred Communications* (1986) 476 U.S. 488, 494-495 [90 L.Ed.2d 480, 487-488, 106 S.Ct. 2034, 2037-2038]; *Weaver* v. *Jordan* (1966) 64 Cal.2d 235 [49 Cal.Rptr. 537, 411 P.2d 289]), however, the cable television medium differs significantly from the print medium and this difference justifies different treatment.

Delivery of the print medium to an apartment dweller involves, at most, a transitory trespass of private property, e.g., tossing the newspaper on the front step or dropping the newspaper in the hallway outside the tenant's apartment. In contrast, delivery of the cable television medium involves a nontransistory physical invasion of private property; it involves physically attaching cable equipment to the owner's building. Unlike the transitory trespass involved in the delivery (or right of access) of print media, Cox's asserted right of access collides with the Fifth Amendment's prohibition against taking private property without just compensation.

In *Loretto* v. *Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], the United States Supreme Court considered a statute giving cable television companies a right of access to apartment buildings. The statute required landlords to permit cable companies access to their tenants and to affix cable equipment to the landlord's building. The statute was intended to promote " 'rapid development of and maximum penetration by a means of communication which has important educational and community aspects' " (*id*. at p. 425 [73 L.Ed.2d at pp. 875-876]), a goal consistent with First Amendment principles. The Supreme Court observed this was a legitimate public purpose, but found the statute

---

[2] On appeal, Cox does not argue it is entitled to a preliminary injunction based on the likelihood it will prevail on its contract with Bookspan's predecessor; Cox limits its argument to an entitlement based on the First Amendment.

resulted in a permanent physical occupation by cable companies of the landlord's property and concluded "that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve." (*Id*. at p. 426 [73 L.Ed.2d at p. 876].)

The Supreme Court explained a permanent physical occupation "is perhaps the most serious form of invasion of an owner's property interests." (*Id*. at p. 435 [73 L.Ed.2d at p. 882].) In such a case "the government does not simply take a single 'strand' from the 'bundle' of property rights: it chops through the bundle, taking a slice of every strand." (*Ibid*.) A permanent physical occupation by the cable company denies the owner his right to possess and use the space himself and to exclude others from possessing and using the space. (*Id*. at p. 436 [73 L.Ed.2d at p. 882.) It "forever denies the owner any power to control the use of the property." (*Ibid*.)

The physical invasion of private property is no less an invasion if it is authorized by the courts through the granting of a preliminary injunction[3] than if authorized by the Legislature enacting a statute mandating a right of access to cable companies. A taking of private property occurs in either case.

■ The power to take property is strictly limited. An individual or entity may take private property, that is, exercise the power of eminent domain, only if the taking is for a public use and only if a statute specifically grants the individual or entity the power of eminent domain. (*People* v. *Superior Court* (1937) 10 Cal.2d 288, 295-296 [73 P.2d 1221]; Code Civ. Proc., §§ 1240.010, 1240.020.) ■ There are no statutes granting cable companies a power of eminent domain nor can such a grant be implied from the statutes regulating cable television systems.[4]

The Legislature has enacted some statutes addressing cable television access but has not given a right of access to the cable television companies. In Government Code section 66473.3, the Legislature has authorized the legislative bodies of cities and counties (not cable television companies) to require developers, as a condition of a subdivision map approval, "to provide one or more appropriate cable television systems[5] an opportunity to

---

[3] A preliminary injunction is only a temporary remedy. We note, however, that the United States Supreme Court has recently held that just compensation is required for a temporary taking due to an unconstitutional land use regulation. (See *First English Evan. Luth. Ch.* v. *Los Angeles Cty.* (1987) 482 U.S. 304 [96 L.Ed.2d 250, 107 S.Ct. 2378].)

[4] Cox's reliance on other states as having granted a right of access to cable companies rests on statutory enactments. (See Conn. Gen. Stat. Ann. § 16-333a; Fla. Stat. Ann. § 83.66; Kan. Stat. Ann. § 58-2553(5); Mass. Gen. Laws Ann., ch. 166 A, § 22; Minn. Stat. Ann. § 238.33(1); N.J. Stat. Ann. § 48:5A-49; Va. Code, § 55-248.13:2.)

[5] "Appropriate cable television systems" are defined as "those franchised or licensed to serve the geographical area in which the subdivision is located." (Gov. Code, § 66473.3.)

construct, install, and maintain . . . any equipment necessary to extend cable television services to each residential parcel in the subdivision." This section applies only to new developments; the Legislature specifically exempted "the conversion of existing dwelling units to condominiums, community apartments, or stock cooperatives." (Gov. Code, § 66473.3.)

The Legislature has also authorized public utilities to make available space and capacity on their utility poles and systems to cable companies for a fee if the utility has surplus space and excess capacity. (Pub. Util. Code, § 767.5.) This authorization is granted to public utilities, not cable television companies.[6]

Finally, the Legislature has given control over cable television access to cities and counties (not cable companies) through a franchising procedure. (See Gov. Code, § 53066 et seq.)

Nor are there any statutes authorizing the courts to order a taking on behalf of a cable television company for a use which they might believe would be for the public good. Such a statute, if it existed, would clearly violate the doctrine of separation of powers. It is for the Legislature, not the judiciary, to determine what public uses justify the exercise of the power of eminent domain and who should be entitled to exercise that power. (See Code Civ. Proc., §§ 1240.010, 1240.040.)

While our analysis here resolves the issues presented on appeal, we shall briefly address Cox's First Amendment arguments to demonstrate their lack of persuasiveness.

### III

Cox argues that Bookspan may not exclude Cox's system from Woodlawn in favor of Ultronics' system without offending First Amendment proscriptions against censorship, prior restraint of speech and discrimination without a compelling justification.

---

[6] Compare *Salvaty* v. *Falcon Cable Television* (1985) 165 Cal.App.3d 798 [212 Cal.Rptr. 31], holding that a landowner's consent was not necessary before a cable company installed its equipment on a telephone pole situated on the telephone company's easement on the property because the installation was within the scope of telephone company's easement which it had apportioned to the cable company. (*Id.* at p. 799.)

See also *Witteman* v. *Jack Barry Cable TV* (1986) 192 Cal.App.3d 1619 [228 Cal.Rptr. 584], review dismissed as improvidently granted by Supreme Court, September 3, 1987. In *Witteman,* the appellate court affirmed a summary judgment on a property owner's action for trespass and injunctive relief against a public utility and cable television company that had strung cable television wires across his property pursuant to easements held by the city and utility. The court held the easements were apportionable and the cable television company was not required to obtain the property owner's consent before stringing its wires.

The First Amendment's prohibitions against interfering with speech generally apply to interference by the government, not by private individuals on private property. Here, Bookspan is a private citizen. Woodlawn is private property.

First Amendment protection, however, has been extended in certain limited circumstances to reach private individuals and property when the individuals and land are the functional equivalent of a municipality or of a public forum. Thus, First Amendment protection has been extended to protect individuals selling religious publications on the streets of a privately owned company town (see *Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66 S.Ct. 276]), soliciting signatures for a petition and leafletting in a privately owned shopping mall (see *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341]) and distributing unsolicited newspapers in a large private retirement community where the community had already permitted the distribution of another unsolicited newspaper to residents (see *Laguna Publishing Co.* v. *Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813]).

Cox argues these cases support its position that the First Amendment prohibits interference by the private landlord here. We, however, find these cases distinguishable on their facts.

Nothing in the record suggests that the 150-unit Woodlawn apartment complex has the attributes of a quasi-municipality. The record does not indicate that Woodlawn has its own system of roads and streets, security force, parks, recreation facilities, self-government dealing with internal maintenance, security or operation of the complex or other indicia of a quasi-municipality. (Cf. *Laguna Publishing Co.* v. *Golden Rain Foundation, supra*, 131 Cal.App.3d at p. 843, fn. 10.)

Nor is there anything in the record to suggest that Woodlawn is a quasi-public forum like a shopping mall where the public is invited to gather. Instead, Woodlawn is a place where the public is generally excluded, where an individual can escape the public forum by retreating into his or her apartment and closing the door. Specifically, Woodlawn is not a place where the public is generally invited to set up communication equipment or attach it to the various apartment buildings.

The cases on which Cox relies all involve, at most, transitory trespasses by leafletters and speakers. None involve the sort of permanent physical occupation sought here. In none of the cited cases were the individuals seeking to erect a permanent structure. Those cases would be more similar to Cox's situation if, in those cases, the individuals were given the right to

build a permanent kiosk to disseminate information or to erect a permanent stage with attached amplification equipment for speeches. Cox's requested right of access here is analogous to a publisher seeking a right to cut slots in apartment doors so it can deliver its newspapers directly. The First Amendment has yet to be extended so far.

As the Supreme Court noted in *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899: "By no means do we imply that those who wish to disseminate ideas have free rein. We noted above Chief Justice Traynor's endorsement of time, place, and manner rules. [Citation.] Further, as Justice Mosk stated in *Diamond II,* 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Id.* at pp. 910-911.)

Here we have involved a private apartment complex. The intrusion here does dilute the owner's property rights. As the Supreme Court noted in *Loretto* v. *Teleprompter Manhattan CATV Corp., supra,* 458 U.S. at page 436 [73 L.Ed.2d at pp. 882-883], where an owner is compelled to allow a cable company to attach its equipment to his or her building, "even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property."

## IV

Finally, even if we were to conclude the situation here came within the ambit of the *Marsh-Pruneyard-Laguna* cases, e.g., if we were to conclude Woodlawn was a quasi-municipality with Bookspan as its one-man government, we still would not find the court abused its discretion in denying the preliminary injunction.

Recently, the United States Supreme Court in *Los Angeles* v. *Preferred Communications, supra,* 476 U.S. 488, addressed a challenge by a CATV company to a city's practice of granting exclusive cable franchises in various geographical areas of the city, that is, a challenge to the city's restriction of

access. In *Preferred Communications,* the cable television operator alleged there was sufficient excess physical capacity on utility poles and underground conduits and sufficient economic demand for cable television operators in the area which the company sought to serve. The City admitted there was sufficient excess capacity, but justified its exclusive franchising in terms of minimizing cable system demands on public property, including the "visual blight" caused by the wires and the disruption of traffic and facilities by the installation and maintenance of cable systems. (*Id.* at p. 493 [90 L.Ed.2d at p. 486].)

The Supreme Court held the cable company stated a cause of action under the First Amendment, but remanded the case for further factual proceedings. The court stated: "[T]he conclusion that respondent's factual allegations implicate protected speech does not end the inquiry. 'Even protected speech is not equally permissible in all places and at all times.' [Citation.] Moreover, where speech and conduct are joined in a single course of action, the First Amendment values must be balanced against competing societal interests. [Citations.] We do not think, however, that it is desirable to express any more detailed views on the proper resolution of the First Amendment question raised . . . without a fuller development of the disputed issues in the case." (*Id.* at p. 495 [90 L.Ed.2d at pp. 487-488].)

Here, Cox contends there is "excess capacity," i.e., that Woodlawn's internal wiring can support both its systems as well as the Ultronics' system. Bookspan and Ultronics initially contended Woodlawn could not accommodate both systems, citing interference and auditing problems. However, at the time of the hearing, both Cox and Ultronics were delivering cable television to Woodlawn. Bookspan and Ultronics conceded that they could "structure something to hook up apartment no. 101 onto the Cox Cable system and apartment 102 onto the satellite master antenna television system."

Bookspan and Ultronics, however, contended both systems could not economically coexist at Woodlawn, that if Cox were permitted to remain in the complex, the owners of premium cable channels would not contract with Ultronics. Cox indicated it was willing to make arrangements so Ultronics could have premium cable channels, but the evidence suggests Cox would only make the premium channels available at an exorbitant cost (charging Ultronics on the basis of all 150 units at Woodlawn). Bookspan's attorney stated granting the preliminary injunction "ultimately it will require my client to remove the installed satellite master antenna television system." The court asked what the attorney meant by the term "ultimately require?" Bookspan's attorney responded: "It goes hand in hand with the

inability to have the two systems to compete in the same complex, your honor, and that is a matter of business and business within the industry."

This evidence suggests that, as a practical matter, Woodlawn could support only one cable system, either Cox's CATV system *or* Ultronics' SMATV system. Given this fact, Bookspan had no less restrictive means of regulating the speech; he was forced to choose between the two systems because the forum could not accommodate both. (Cf. *Laguna Publishing Co.* v. *Golden Rain Foundation, supra,* 131 Cal.App.3d 816; *Central Telecommunications* v. *TCI Cablevision* (8th Cir. 1986) 800 F.2d 711; cf. *Century Federal, Inc.* v. *City of Palo Alto, Cal.* (N.D. Cal. 1986) 648 F.Supp. 1465.)

The United States Supreme Court has not held a city (or individual) is absolutely barred from granting an exclusive access (or franchise) if the marketplace can only support one cable system. The ability of the marketplace to support more than one system was a premise of the cable television operator's claim in *Preferred Communications* and it is a relevant factor here. No case has held to the contrary, i.e., that a cable television company is entitled to access, even temporarily, when it has not been shown that an area can support more than one system. (Cf. *Pacific West Cable Co.* v. *City of Sacramento, Cal.* (9th Cir. 1986) 798 F.2d 353.)[7]

Here, as between the two speakers—Cox and Ultronics —the evidence showed at the time of the hearing, Cox had reconnected only about a dozen subscribers in two buildings while Ultronics was operational as to all 150 units. The Ultronics system had been installed at a cost of $54,000, an investment which would be lost if Cox were granted the preliminary injunction. On these facts, the trial court was entitled to conclude the interim harm to Ultronics and Bookspan by granting the injunction would be greater than the interim harm which would occur if the preliminary injunction were granted and that Cox's lost subscriptions and goodwill could be compensated with money damages should it prevail on the merits (i.e., establish its contract claim, or right to the "franchise").

---

[7] In *Pacific West Cable Co.* v. *City of Sacramento, Cal., supra,* 798 F.2d 353, the Ninth Circuit affirmed the denial of a preliminary injunction against the city and county to enjoin them from denying a cable company an opportunity to build and operate a cable television system. The court stated: "What is clear is that the district court could not grant the open-ended preliminary injunction that Pacific requests without infringing the legitimate power of Sacramento to prevent disruption of the public domain. Nothing in our earlier decision in *Preferred* . . . requires that a municipality open its doors to all cable-television comers, regardless of size, shape, quality, qualifications or threat to the ultimate capacity of the system." (*Id.* at p. 355.)

## DISPOSITION

The order is affirmed.

Butler, J., and Huffman, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.