**STATE of Delaware, Plaintiff,**

v.

**Stephen C. ELLIOTT, Walter G. Gies, Patrick F. Harrison, George H. Maurer, III, Pamela Reyburn, Defendants.**

Superior Court of Delaware, New Castle County.

Submitted: Jan. 27, 1988.
Decided: Sept. 2, 1988.

Thomas E. Carluccio, Deputy Atty. Gen., Dept. of Justice, Wilmington, for plaintiff.

David J. Facciolo, Asst. Public Defender of the State of Del., for defendants.

## OPINION

MARTIN, Judge.

This motion for judgment of acquittal, notwithstanding the verdict, was brought by defendants Stephen C. Elliott, Walter G.

Gies and Patrick F. Harrison contesting their convictions for Criminal Trespass in the Third Degree [1] and Disorderly Conduct,[2] and by Pamela Reyburn and George H. Maurer, III for convictions of Criminal Trespass in the Third Degree. The defendants seek acquittal of such convictions alleging that the Delaware statutes of Criminal Trespass in the Third Degree and Disorderly Conduct are unconstitutional as applied, since the defendants were deprived of their federal and state [3] constitutional rights of free assembly. For the reasons stated herein, the motion is denied and the convictions stand.

On June 20, 1987 the defendants were arrested while they were participating in an anti-abortion demonstration. The defendants and a number of other demonstrators gathered at the Shop Rite grocery store parking lot directly next to the Delaware Women's Health Organization ("Health Organization", "Clinic") located at 2123 West Newport Pike, Stanton, Delaware. At all relevant times the Health Organization was the sole occupant of a single building which provided a variety of gynecological-obstetrical health services including abortions.

The Health Organization was the site of frequent, regular anti-abortion demonstrations. Over a period of time there had been repeated incidents of demonstrators coming onto the Health Organization's property attempting to convince people not to go into the building. In an effort to keep the demonstrators off of the Health Organization's property, a "no trespassing" sign was placed in plain view and clearly visible white lines were painted on the ground parallel and proximate to the Health Organization's property lines. Furthermore, on the day in question, personnel of the Health Organization gave verbal warnings to the demonstrators to stay off the Clinic's property. Such personnel attempted to keep the demonstrators off the Health Organization's property only, and they did not attempt to keep the demonstrators from any location other than the Health Organization's property. One who was on the property of the Health Organization could easily hear and see the activities of the demonstrators on Shop Rite's adjacent property.

1. 11 *Del.C.* § 821 reads, in pertinent part, as follows:
   A person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully upon real property.

2. 11 *Del.C.* § 1301 reads, in pertinent part, as follows:
   A person is guilty of disorderly conduct when:
   (1) He intentionally causes public inconvenience, annoyance or alarm to any other person, or creates a risk thereof by:
   a. Engaging in fighting or in violent, tumultuous or threatening behavior; or
   b. Making an unreasonable noise or an offensively coarse utterance, gesture or display, or addressing abusive language to any person present; or
   c. Disturbing any lawful assembly or meeting of persons without lawful authority; or
   d. Obstructing vehicular or pedestrian traffic; or
   e. Congregating with other persons in a public place and refusing to comply with a lawful order of the police to disperse; or
   f. Creating a hazardous or physically offensive condition which serves no legitimate purpose; or
   g. Congregating with other persons in a public place while wearing mask, hoods, or other garments rending their faces unrecognizable, unrecognizable, for the purpose of and in a manner likely to imminently subject to the deprivation of any rights, privileges or immunities secured by the Constitution or laws of the United States of America.
   (2) He engages with at least 1 other person in a course of disorderly conduct as defined in subdivision (1) of this section which is likely to cause substantial harm or serious inconvenience, annoyance or alarm, and refuses or knowingly fails to obey an order to disperse made by a peace officer to the participants.

3. *Del.C.* Ann. Const. of 1897 Art. I, § 16 reads, in pertinent part, as follows:
   Although disobedience to laws by a part of the people, upon suggestions of impolicy or injustice in them, tends by immediate effect and the influence of example not only to endanger the public welfare and safety, but also in governments of a republican form contravenes the social principles of such governments, founded on common consent for common good; yet the citizens have a right in an orderly manner to meet together, and to apply to persons intrusted with the powers of government, for redress of grievances or other proper purposes, by petition, remonstrance or address.

On the day the defendants were arrested, a number of demonstrators were gathered around the Health Organization property expressing the theme of their protests in various forms. Some of the demonstrators used megaphones and yelled comments to individuals entering the Clinic such as "the doctor in there is a murderer," "we are here to save the babies" and "that is a killing center in there." Picket signs with similar written statements were carried and posters picturing a developing human fetus were shown. Exhibits comprised of actual human fetal tissue and skeletal remnants were displayed. The emotional atmosphere of the gathering was volatile.

The Clinic's director told the demonstrators to stay off the Clinic's property, and warned that if they did not, the police would be called. Despite these warnings, the defendants went onto the Health Organization's property apparently knowing they were unwanted on private property. Consequently an employee of the Health Organization called the police. The defendants were subsequently arrested.

All of the defendants were charged with Disorderly Conduct and Trespass in the Third Degree. Ultimately all of the defendants were convicted by jury of Criminal Trespass in the Third Degree. However, only Mr. Elliott, Mr. Gies and Mr. Harrison were convicted of Disorderly Conduct. Ms. Reyburn was acquitted of such charge by this Court and the jury was hung as to Mr. Maurer.

The issue before this Court is whether or not the defendants were deprived of their right to free assembly, as provided by the United States Constitution and the Constitution of the State of Delaware, by being prohibited from entering onto the Health Organization's private property to engage in anti-abortion demonstrations. For the reasons set forth herein, the defendants were not deprived of such right.

■ The defendants argue that the states can, and should, regard state constitutions as providing specific protection against the undue interference of private landowners when such property is held out for a public purpose. The defendants, citing a battery of United States Supreme Court cases [4] and a Washington case, reiterate the general principle that expressional activity is protected on private property, such as in shopping centers, since the more the private property is opened for public use, the public accordingly has greater constitutional rights to expressional activity on such property. The defendants assert that this principle is properly applied to the private property of the Health Organization. Additionally, the defendants argue that the Delaware Constitution provides greater leverage for protection of free speech, even in a private landowner's context than the Federal Constitution. However, counsel cites no authority for this argument. Nevertheless, this Court will show that under the Delaware Constitution there was no violation of the defendants' right to freedom of assembly [5] or speech.[6]

---

4. Specifically, such landowners should not be entitled to prevent individuals from picketing on the landowner's private property. *Alderwood Associates v. Washington Environmental Council,* Wash., 635 P.2d 108 (1981); *Amalgamated Food Employees Union Local v. Logan Valley Plaza,* 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); *Lloyd Corporation v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972); *Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Hudgens v. National Labor Relations Board,* 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976).

5. This Court does not presently decide whether the Delaware Constitution provides equal or greater such leverage than the Federal Constitution. Since, at a minimum, Delaware's protec-

tion must be equal to the Federal Constitution, this case decision pertains only to the Federal Constitution.

6. The rights of freedom of assembly and freedom of speech are closely related and frequently considered together as one concept in some of the authorities cited herein. There has been no allegation in the case *sub judice* that the defendants were denied their rights to freedom of speech inasmuch as the use of voices, megaphones and signs unquestionably conveyed visual and aural messages to those entering the Health Organization. The allegations herein address the defendants prohibition from assembling on the Health Organization's property, albeit to exercise their free speech rights in a location more proximate to their intended audience.

██ "The rights to free speech, to assembly, and to petition the government for grievances are a cornerstone of the American system. So, too, is the right to be free from criminal interference." *Gaetano v. United States*, D.C.App., 406 A.2d 1291, 1295 (1979). The right of petition and assembly, as provided by the Delaware Constitution, does not mean that those who elect to enjoy this right also have the privilege to be the sole decision makers as to the way to exercise their rights under Art. I, Sec. 16. *Piekarski v. Smith*, Del.Supr., 153 A.2d 587, 592 (1959). The right of assembly is not an unlimited right, but a right subject to certain qualifications as imposed by the state's police power. *Taylor v. Municipal Court for the City of Wilmington*, Del.Super., 247 A.2d 914 (1968). While the First Amendment of the United States Constitution guarantees the right of free speech, this does not mean that the state does not have the authority to regulate conduct which adversely affects the public interest, and indirectly affects the right of free speech. *State of Delaware v. Ayers*, Del.Supr., 260 A.2d 162, 168 (1969). When the state, in the public interest, properly regulates certain types of conduct, the right of free speech does not prevent the regulation of such conduct. *Id.* "The fact that free speech is inseparably mixed up with the regulated conduct, does not constitute a constitutional interdict against the regulation." *Id.* Furthermore, "a prohibition against picketing and mass demonstration does not abridge free speech when the "activity bears no necessary relationship to the freedom to ... distribute information or opinion." *Id.* at 169.

Our neighboring state of New Jersey has confronted and resolved almost the exact issue as does this Court in the case *sub judice*. The Court in *State of New Jersey v. Brown*, N.J.Super.Ct.App.Div., 513 A.2d 974 (1986), employed a logical, well constructed analytical tool implemented by New Jersey's highest court in *State v.*

*Schmid*, 84 N.J. 535, 423 A.2d 615 (1980). In *Brown*, the Court held that anti-abortion demonstrators could not hold demonstrations in the common areas of a business complex, which included a women's health care facility, because the complex was not sufficiently dedicated to public use. The facility provided a variety of medical services including abortions. As specifically noted by the *Brown* Court, other jurisdictions do not favor anti-abortion expression over private property interests. *Brown*, 513 A.2d at 976.

The *Schmid* analysis has an initial threshold question which, if answered affirmatively, is followed by a three-prong accommodation test which is evaluated on a "sliding scale." *Brown*, 513 A.2d 974.

██ The *Schmid* Court recognized that "the more private property is devoted to public use, the more it must accommodate the rights which inhere in individual members of the general public who use that property." *Schmid*, 423 A.2d at 629. The initial question is whether or not the owner has devoted the property to public use, as the term is used in the federal and state freedom of expression cases, so as to create an expressional obligation entitling individuals access for first amendment activities. Property, however, does not lose its private character merely because the public is invited to use it for a specific purpose. *Id.* at 975.

If the property has been adequately devoted to public use, then the following aforementioned three prong accommodation test is used as a guideline:

"(1) the nature, purpose, and primary use of such private property, generally its 'normal' use,

(2) the extent and nature of the public's invitation to use that property, and

(3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property." *Schmid*, 423 A.2d at 630.[7]

---

[7] In a Pennsylvania case factually similar to the case at bar and *Brown*, the majority denied anti-abortion demonstrators access to private property. While the majority did not employ the *Schmid* analysis, the concurring opinion specifically noted the usefulness of the *Schmid*

■ This Court has considered the *Schmid* threshold question and finds that the Health Organization has not been adequately devoted to public use such that it is subject to such expressional obligations. Therefore, the defendants were properly denied entry onto the Health Organization's property.

The court reached a similar result in *Brown*, where a women's health care center was located in a multi-business office complex. In the case at bar, the Health Organization is even less open to the public since it is a single facility isolated from any other buildings. The general public is not invited to use the property and does not use it. *Brown*, 513 A.2d at 976. Accordingly, the aforementioned accommodation test does not need to be applied to decide this case.

Alternatively, this Court notes, as did the *Brown* Court, that even upon application of the test, as follows, the demonstrators would not prevail. *Id.*

1. "the nature, purposes and primary use of such private property, generally, its 'normal' use," *Brown*, 513 A.2d at 976.

■ In *Brown*, the Court stated that the New Jersey women's center solicited a narrow segment of the public comprised only of women who wished to use its gynecological services. Furthermore, the property was not the functional equivalent of a suburban shopping center nor was it a place where a general consumer would go to shop for general, personal, household or general business merchandise. Furthermore, there was no area which contemplated the congregation of people or the dissemination of literature. *Id.* at 977.

Similarly, the Health Organization solicits the same type of narrow population. Additionally, it was a single building offering only gynecological medical services. It is not similar to a suburban shopping center and a general consumer would not go onto the property to shop. While the Shop Rite supermarket property adjacent was next to the Health Organization's property,

the Health Organization did not object to the fact that those entering the Health Organization could hear and see the demonstrators activities. The Health Organization's property lot is limited and appears to be set up to provide only a small parking area for employees and patients with a short walkway into the building. It was not designed for a congregation of people. It is clear that its normal use is to accommodate the needs of employees and patients only.

2. "the extent and nature of the public's invitation to use that property" *Brown*, 513 A.2d at 976.

■ In *Brown*, the women's center was not a public forum but deemed to be clearly for private and personal purpose. Furthermore, the invitation to use the services was directed to prospective patients and not to the general public to enter onto the premises. *Id.* at 977.

The instant case is similar. The Health Organization was not a public forum and did not invite the public in general onto the property. The Health Organization offered specific gynecological services to only those individuals who wished to use such services.

3. "the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property." *Brown*, 513 A.2d 976.

■ In *Brown*, the Court found that the purpose of the expressional activity was incompatible with some of the services rendered. There was no testimony in *Brown* that any prospective user of the women's center was offended, intimidated, or refused to receive the medical services as a result of the demonstrator's conduct. However, the testimony in *Brown* revealed that female employees dressed in white uniforms met some of the prospective patients as they left their cars and escorted them to the door of the women's center. The Court concluded that this activity was not one normally supplied to patients, but was intended to counter the effects of the

test. *Crozer Chester Medical Center v. May*, Pa. Super.Ct., 506 A.2d 1377, 1384 (1986).

demonstrators' expressional activity. *Id.* at 977–978.

In the case at bar, the purpose of the expressional activity was to dissuade persons from entering the Health Organization because of its abortion services. As in *Brown*, there is no testimony that prospective patients were offended, intimidated or refused treatment because of the demonstrators' conduct. However, this activity is inappropriate and incompatible with the Health Organization's activities. The activity is inappropriate since the Health Organization provides gynecological services other than abortions. Furthermore, the activity is incompatible since such demonstrations are not acts which are ordinary incidents to the receipt of medical services.

This Court concludes that the Health Organization did not devote its property to public use such that it was subject to expressional obligations. Even if it had been so devoted, the defendants still would not be entitled to demonstrate on the Health Organization's property under the *Schmid* accommodation test. The defendants do not cite any Delaware authority specifically addressing the instant issue, nor has this Court found any such authority. However, the holding presently reached by this Court is clearly consistent with the aforementioned Delaware case law.

Therefore, Motions for Judgment of Acquittal for all defendants are DENIED.

IT IS SO ORDERED.