[No. D011865. Fourth Dist., Div. One. Oct. 10, 1991.]

PLANNED PARENTHOOD OF SAN DIEGO AND RIVERSIDE
COUNTIES, Plaintiff and Respondent, v.
TIMOTHY DEE WILSON et al., Defendants and Appellants.

**COUNSEL**

Adkins, Fuhrman & Holthaus, Michael R. Adkins, Branton & Wilson and Michael N. Taylor for Defendants and Appellants.

Baker & McKenzie, Abby B. Silverman, X. Jay Alvarez and Jill L. Burkhardt for Plaintiff and Respondent.

**OPINION**

**WORK, Acting P. J.**—Timothy Dee Wilson and Michaelene Jenkins (the protesters) appeal an order granting a preliminary injunction to Planned Parenthood of San Diego and Riverside Counties (Planned Parenthood). The order specifically restricts them from blocking or slowing cars entering from the street into the parking lot of the Mission Valley Medical Center (Medical Center) where Planned Parenthood provides medical services, including reproductive health services to which the protesters are opposed. It also enjoins the protesters from generally using the parking lot for demonstration purposes, restricting this type of activity to that portion of the public sidewalk which does not cross the driveway. The protesters contend the preliminary injunction is unconstitutionally overbroad because it unreasonably restricts their ability to reach their targeted audience, i.e. persons who are about to enter Planned Parenthood's facility to seek abortion services or reproductive advice which may include abortion as an option. They contend prohibiting their access to the parking lot, which they characterize as a public forum, abridges their fundamental rights of freedom of expression. As we shall explain, we conclude this privately owned Medical Center is not so devoted to public use that it can be deemed the functional equivalent of the

traditional public forum historically provided by town centers, public streets and public sidewalks, as is the case with the major metropolitan retail shopping mall addressed in *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910 [153 Cal.Rptr. 854, 592 P.2d 341]. Accordingly, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

Planned Parenthood operates a women's health care facility offering various reproductive health and gynecological services including abortions. The protesters oppose abortions on moral, religious and legal grounds and seek to dissuade women from having abortions and to consider alternatives. Planned Parenthood's clinic is located in the Medical Center, a three-story building consisting of six medical offices. A single driveway leads from the street into the parking lot located behind the building. The only vehicle entrance to the parking lot crosses the sidewalk in front of the Medical Center and proceeds approximately 100 feet upwards to the rear of the building. In mid-September 1989, the Medical Center owner instructed Planned Parenthood to post five "No Trespassing" signs throughout the parking lot, including the entrance. Each parking space within the lot is specifically designated for either patients or employees of tenants only.

Planned Parenthood has provided medical services including reproductive health services to residents of San Diego County since 1969. Currently it offers abortions and abortion counseling services at this clinic, where actual abortion procedures are performed on the premises on Saturdays. Commencing in mid-August 1989, antiabortion activists began protesting and distributing literature to Planned Parenthood's patients on Saturdays, when they departed their vehicles and approached the clinic's entrance in the rear of the building.[1] These antiabortion activities were conducted both on the sidewalk in front of the clinic and in the rear parking lot. On several occasions, security guards have arrested protesters within the parking lot for trespass and for harassing Planned Parenthood's patients. Declarations described the protesters' activities as aggressively approaching patients of Planned Parenthood; verbally harassing them; chasing them up the driveway to the entrance of the Medical Center; and walking very slowly across the driveway entrance to deter patients from entering, a ploy which forced some patients to park at nearby restaurants and return by foot to face verbal harassment.

Wilson and Jenkins regularly participate in Operation Rescue blockade activities. Wilson reputedly had repeatedly harassed Planned Parenthood's

---

[1] Of the six medical offices which occupy the Medical Center, only two tenants, Planned Parenthood and the Mission Valley Medical Clinic, are open by appointment only on Saturdays.

patients by forcing unwanted literature upon them. Jenkins had been arrested on numerous occasions and her actions had become increasingly intrusive, including running toward patients and vehicles within the parking lot; forcibly attempting to distribute antiabortion literature even after the material had been refused; and shouting at patients: "Don't do it. Don't kill your baby, they've lied to you. They haven't told you how horrible it will be—how you could die from this procedure—how you might not be able to have any more babies if you have this procedure!" Jenkins had been arrested several times for refusing to leave the parking lot upon request, once being arrested for trespassing and then rearrested when she returned the same day.

When arrests did not deter these continuing harassment tactics, Planned Parenthood finally sought injunctive relief. On November 17, a temporary restraining order (TRO) was issued stating in part:

"1. Obstructing, hindering, or interfering with in any way the free and direct passage of any person in or out of PLANNED PARENTHOOD;

"2. In any way obstructing, interfering with or hindering ingress or egress to the entrance to the parking lot utilized by PLANNED PARENTHOOD'S clients and employees;

"3. Trespassing upon PLANNED PARENTHOOD's private property, excluding the parking lot;

"4. Shouting, screaming, chanting, yelling, singing, or producing noise which substantially interferes with PLANNED PARENTHOOD's ability to provide safe and proper health care services;

" . . . . . . . . . . . . . . . . . . . . . . . .

"6. Menacing, molesting, harassing, or interfering with PLANNED PARENTHOOD's clients and employees."

The trial court denied Planned Parenthood's request to temporarily prohibit the protesters from entering into the Medical Center's parking lot. On January 5, after further briefing and oral argument, the trial court granted a preliminary injunction, expanding the terms of the TRO to prevent the protesters from entering the private parking lot to conduct their antiabortion activities. The injunction expressly provided:

"Defendants are enjoined from blocking the movement of cars from the street into the lot; from slowing them or sticking bodies or objects into openings; from using the parking lot for demonstration purposes. Defendants

are allowed on the public sidewalk, but not the portion of the sidewalk crossing the driveway." The expanded restrictions reflected the trial court's conclusion the protesters had an adequate opportunity to exercise their First Amendment rights on the public sidewalk in front of the building. Thus, the court impliedly rejected their argument the Medical Center parking lot constituted a public forum in which they are entitled to exercise their First Amendment rights subject to reasonable time, place and manner restrictions. It also rejected their assertion that access to the public sidewalk did not provide them a meaningful opportunity to exercise their First Amendment rights before their targeted audience.[2]

## GOVERNING STANDARD OF REVIEW

 The grant of a preliminary injunction is within the sound discretion of the trial court and that discretion will not be disturbed on appeal absent a showing of a clear abuse. (*City of Torrance* v. *Transitional Living Centers for Los Angeles, Inc.* (1982) 30 Cal.3d 516, 519 [179 Cal.Rptr. 907, 638 P.2d 1304]; *Continental Baking Co.* v. *Katz* (1968) 68 Cal.2d 512, 527 [67 Cal.Rptr. 761, 439 P.2d 889]; *DeYoung* v. *City of San Diego* (1983) 147 Cal.App.3d 11, 16 [194 Cal.Rptr. 722].)[3] "Normally, plaintiffs must establish that pending trial on the merits, defendants should be restrained from exercising the right claimed by them, as the underlying purpose of the injunction is to preserve the status quo until a final determination is made upon the merits. Consequently, the court must determine whether defendants would suffer greater harm from issuance of the preliminary injunction than the plaintiffs would suffer from its refusal, considering the reasonable probability the plaintiffs would ultimately prevail on the merits. [Citations.]" (*DeYoung* v. *City of San Diego, supra,* 147 Cal.App.3d at pp. 16-17.) An abuse of trial court discretion will be found only where it has " ' "exceeded the bounds of reason or contravened the uncontradicted evidence." ' " (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 69, quoting *Continental Baking Co.* v. *Katz, supra,* 68 Cal.2d at p. 527.) The party challenging the injunction has the burden to clearly show an abuse of discretion. (*IT Corp.* v. *County of Imperial, supra,* 35 Cal.3d at p. 69; see generally, *Chico Feminist Women's Health Center* v. *Scully* (1989) 208 Cal.App.3d 230, 239-240 [256 Cal.Rptr. 194].)

---

[2] The trial court denied a motion for reconsideration.

[3] " 'The authorities are numerous and uniform to the effect that the granting or denial of a preliminary injunction on a verified complaint, together with oral testimony or affidavits, even though the evidence with respect to the absolute right therefor may be conflicting, rests in the sound discretion of the trial court, and that the order may not be interfered with on appeal, except for an abuse of discretion. [Citations.]' " (*IT Corp.* v. *County of Imperial* (1983) 35 Cal.3d 63, 69 [196 Cal.Rptr. 715, 672 P.2d 121], quoting *People* v. *Black's Food Store* (1940) 16 Cal.2d 59, 61 [105 P.2d 361].)

## THE PRELIMINARY INJUNCTION WAS PROPERLY GRANTED

■ Under the First Amendment to the federal Constitution, private individuals do not have an unqualified right to engage in free expression and assembly on private property. (*Hudgens* v. *NLRB* (1976) 424 U.S. 507, 518, 521 [47 L.Ed.2d 196, 207-208, 96 S.Ct. 1029] [no First Amendment right to picket a store in a privately owned shopping center]; *Lloyd Corp.* v. *Tanner* (1972) 407 U.S. 551, 567-570 [33 L.Ed.2d 131, 141-144, 92 S.Ct. 2219] [no First Amendment right to distribute leaflets at a shopping center when the leafleting is unrelated to the shopping center's business or operation].) However, under very limited circumstances, individuals are entitled to exercise First Amendment rights on private property that has been sufficiently devoted to public use. (*Marsh* v. *Alabama* (1946) 326 U.S. 501, 506-507 [90 L.Ed. 265, 268-269, 66 S.Ct. 276] [where private property rights were held to yield to free speech rights regarding distribution of religious literature in a company-owned town, the functional equivalent of a municipality][4]; see *Hudgens* v. *NLRB, supra,* 424 U.S. at pp. 516-521 [47 L.Ed.2d at pp. 204-208] [clarifying the narrowness of the *Marsh* exception, to be applicable only when the private property has assumed all the characteristics of a municipality].) Although the United States Supreme Court has held the First Amendment does not guarantee any rights of expression on private property such as a shopping center (*Lloyd Corp.* v. *Tanner, supra,* 407 U.S. 551; *Hudgens* v. *NLRB, supra,* 424 U.S. 507), it affirmed *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, where the California Supreme Court held the California Constitution (art. I, § 2) protects the expression and petition rights of California citizens even when those rights are exercised in a privately owned shopping center. (*Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 81 [64 L.Ed.2d 741, 751-752, 100 S.Ct. 2035].)

■ More specifically, the United States Supreme Court held a state may give greater protection to individual liberties in its own constitution than is conferred by the federal Constitution. (*Id.* at p. 81 [64 L.Ed.2d at pp. 751-752].)

■ In light of the state's constitutional concern in obtaining a protective balance between an individual's expressional rights and legitimate interests in private property, we must interpret the scope of the *Robins* holding when applied to private property more modestly used by the public than large shopping complexes. As we shall explain, we conclude the Medical Center here is fundamentally and functionally dissimilar from the shopping center considered in *Robins* and is not sufficiently dedicated to

---

[4]The United States Supreme Court pertinently stated in *Marsh* v. *Alabama, supra,* 326 U.S. at page 506 [90 L.Ed. at page 268]: "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

public use to entitle the protesters to exercise their rights of expression and assembly in the parking lot of this privately owned and operated facility.[5]

In *Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d at pages 908-909, the court concluded California's Constitution is more definitive and inclusive in protecting expression and assembly rights than the First Amendment of the United States Constitution. Even so, after holding the California Constitution independently protects speech and petitioning rights reasonably exercised in privately owned shopping centers, it declared it did not intend to "imply that those who wish to disseminate ideas have free rein," and its scope did not include "the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment." (*Id.* at p. 910, quoting *Diamond* v. *Bland* (1974) 11 Cal.3d 331, 345 [113 Cal.Rptr. 468, 521 P.2d 460] [dis. opn. of Mosk, J.]; see *H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193, 1206-1207 [238 Cal.Rptr. 841]; see also *Cox Cable San Diego, Inc.* v. *Bookspan* (1987) 195 Cal.App.3d 22, 30 [240 Cal.Rptr. 407].) Highlighting the qualitative difference between the unique character of the modern shopping center and other publicly used private property, as well as the public role such centers have assumed in contemporary society, the court liberally quoted Justice Mosk's dissenting opinion in *Diamond* v. *Bland, supra,* 11 Cal.3d 331, 342, as follows:

" 'The importance assumed by the shopping center as a place for large groups of citizens to congregate is revealed by statistics: in 21 of the largest metropolitan areas of this country shopping centers account for 50 percent of the retail trade; in some communities the figure is even higher, such as St. Louis (67 percent) and Boston (70 percent). [Citation.] Increasingly, such centers are becoming "miniature downtowns"; some contain

---

[5]The protesters posture their constitutional argument to assert the trial court erred in prohibiting them from demonstrating within the parking lot under article I, section 2 of the California Constitution which affords them greater protection of their right of freedom of expression. We note, given the private ownership character of the property, courts from other jurisdictions have almost unanimously concluded that private property rights of medical center tenants and owners override the rights of citizens expressing antiabortion sentiments, either solely predicated upon First Amendment grounds or on independent state constitutional free speech provisions interpreted to require state action. (See, e.g., *Fardig* v. *Municipality of Anchorage* (Alaska Ct.App. 1990) 785 P. 2d 911, 913-915; *State* v. *Elliott* (Del.Super.Ct. 1988) 548 A.2d 28, 31-34; *Estes* v. *Kapiolani Medical Center* (Hawaii 1990) 787 P. 2d 216, 218-221; *Ingram* v. *Problem Pregnancy of Worcester* (1986) 396 Mass. 720 [488 N.E.2d 408]; *State* v. *Scholberg* (Minn.Ct.App. 1987) 412 N.W.2d 339, 342-344; *Kugler* v. *Ryan* (Mo.Ct.App. 1984) 682 S.W.2d 47; *People* v. *Maher* (1987) 137 Misc.2d 162 [520 N.Y.S.2d 309, 313-314]; *City of Cleveland* v. *Sundermeier* (1989) 48 Ohio App.3d 204 [549 N.E.2d 561, 563-564]; *Hoffart* v. *State* (Tex.Ct.App. 1985) 686 S.W.2d 259; *Right to Life Advo.* v. *Aaron Women's Cl.* (Tex.Ct.App. 1987) 737 S.W.2d 564, 566-569; *State* v. *Horn* (1987) 139 Wis.2d 473 [407 N.W.2d 854, 858-861, fn. 9]; *Radich* v. *Goode* (3d Cir. 1989) 886 F.2d 1391, 1398.)

major department stores, hotels, apartment houses, office buildings, theatres and churches. [Citations.] It has been predicted that there will be 25,000 shopping centers in the United States by 1985. [Citation.] Their significance to shoppers who by choice or necessity avoid travel to the central city is certain to become accentuated in this period of gasoline and energy shortage.'" (*Robins* v. *Pruneyard Shopping Center, supra*, 23 Cal.3d at pp. 910-911, fn. 5, quoting dis. opn. of Mosk, J. in *Diamond* v. *Bland, supra*, 11 Cal.3d at p. 342.) Justice Mosk further emphasized:

"It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights." (*Diamond* v. *Bland, supra*, 11 Cal.3d at p. 345 (dis. opn. of Mosk, J.).)

■ In *Robins*, the court recognized that large retail shopping centers today serve as the functional equivalent for the suburban counterpart of the traditional town center business block, where historically the public's First Amendment activity was exercised and its right to do so scrupulously guarded. However, the court's contrary language implies that smaller businesses or commercial establishments which do not assume this societal role by public invitation and dedication of private property should not fall within the scope of the *Robins* rule. (See Case Comment, *Shopping for a Public Forum: Pruneyard Shopping Center* v. *Robins, Publicly Used Private Property, and Constitutionally Protected Speech* (1981) 21 Santa Clara L.Rev. 801, 838-841.)[6]

---

[6]The "functional equivalent" concept employed in *Marsh* v. *Alabama, supra*, 326 U.S. 501 and *Food Employees* v. *Logan Plaza* (1968) 391 U.S. 308, 318 [20 L.Ed.2d 603, 611-612, 88 S.Ct. 1601], was essentially cast aside in *Lloyd Corp.* v. *Tanner, supra*, 407 U.S. 551, when Justice Powell, writing for the majority, dismissed the importance of *Marsh* by characterizing the company town as "an economic anomaly of the past"; restricted its holding to a company town so complete in its municipal amenities and functions so as to constitute a normal town; and implied the "functional equivalent" terminology in *Food Employees* v. *Logan Plaza, supra*, 391 U.S. 308, was simply dictum and the holding was limited to cases where the activities were directly related to the shopping center's business purposes. (*Lloyd Corp.* v. *Tanner, supra*, 407 U.S. at pp. 561, 563 [33 L.Ed.2d 131, 141-144, 92 S.Ct. 2219].) Technically, the functional equivalent concept was later essentially overruled in *Hudgens* v. *NLRB, supra*, 424 U.S. at pages 516-521 [47 L.Ed.2d at pages 204-208]. (*State* v. *Scholberg, supra*,

A recent Attorney General's Opinion concluded the trespass provisions of Penal Code section 602, subdivision (n) may be constitutionally applied to antiabortion activists picketing on a privately owned parking lot of a small medical clinic which had posted signs declaring the use of the lot was restricted to patients and staff. (73 Ops.Cal.Atty.Gen. 213, 223 (1990).) Correctly recognizing the California progeny of *Robins* provides little aid in resolving the issue of the application of California Constitution, article I, section 2, subdivision (a) to protesters on private property surrounding an abortion clinic,[7] that opinion obtained guidance from foreign precedent, relying on two principal factors in determining whether private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly: to wit, the nature, purposes, and primary uses of the property, and the extent and nature of the public invitation to use the property. (73 Ops.Cal.Atty.Gen., *supra*, at pp. 222-223.) Recognizing that "[s]ervice businesses such as the lawyer, doctor, and insurance agent, are patronized by those having need of the service but their access to the property is generally quite limited" (*id.* at p. 222) and the *Robins* limitation as to an individual homeowner or the "proprietor of a modest retail establishment" within the context of the scope of the public invitation to use specific property, the opinion correctly recognizes the unlikelihood the Supreme Court intended to extend state free speech rights "to a modest service establishment in which the services provided (and the invitation to enter) is limited to a small segment of the public. And of course the express invitation to use the parking lot in question is limited even further to those patients and staff having vehicles to park." (*Id.* at p. 223.)

Similarly, we conclude the private three-story medical center here has not been devoted to general public use in a manner which impresses on that property a constitutional burden to guarantee individuals access for the purpose of interfering with patients who have sought out the clinic to obtain an abortion, whether that interference be through physical intimidation or verbal expression of legitimately held opinion.

The Medical Center's six tenants exclusively offer professional and personal services to specific clientele. It is for use only by individuals with

412 N.W.2d at p. 343.) Consequently, although the United States Supreme Court does not now consider shopping centers as performing the same role as the town business centers of the past, the *Robins* decision demonstrates that our Supreme Court firmly considers the former to be the functional equivalent of the latter. (See *Women's Internat. League etc. Freedom* v. *City of Fresno* (1986) 186 Cal.App.3d 30, 37 [237 Cal.Rptr. 577]; Case Comment, *supra*, 21 Santa Clara L.Rev. at p. 841.)

[7]See generally, *In re Catalano* (1981) 29 Cal.3d 1 [171 Cal.Rptr. 667, 623 P.2d 228]; *Sears, Roebuck & Co.* v. *San Diego County Dist. Counsel of Carpenters* (1979) 25 Cal.3d 317, 326-327 [158 Cal.Rptr. 370, 599 P.2d 676]; *Judlo, Inc.* v. *Vons Companies* (1989) 211 Cal.App.3d 1020] [259 Cal.Rptr. 624]; *Northern California Newspaper Organizing Com.* v. *Solano Associates* (1987) 193 Cal.App.3d 1644 [239 Cal.Rptr. 227]; *U.C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157 [201 Cal.Rptr. 837].

specific business purposes, such as employees, clients and prospective clients of the tenants. The small off-street parking lot is designed to provide a convenient place to park for those having direct business with Medical Center tenants. Each parking spot is labeled for use by "tenants" and "patients," and there is no space for public parking in general. Unlike a large shopping mall or historically recognized public forums like parks, streets or public sidewalks, the Medical Center in no way has acquired the attributes of a public forum. Indeed, both architecturally and by usage, "[i]t presents no significant opportunity to disseminate ideas, and prohibiting such activity on its premises does not curtail the realistic opportunity of citizens to exercise their right of free speech. The center [is] not the functional equivalent of a public place . . . ." (*City of Sunnyside* v. *Lopez* (1988) 50 Wn.App. 786 [751 P.2d 313, 318].) Unlike the 21-acre shopping center containing 65 shops, 10 restaurants and a cinema in *Robins*, the Medical Center here with its parking lot resembles a "modest retail establishment" providing professional and personal services to specific clientele. Although members of the public are invited to avail themselves of the particular services performed by specific tenants providing medical services, they are not invited to congregate, relax, visit, seek out entertainment, browse and shop for personal, household or general business merchandise. In fact, the Medical Center does not even have a pharmacy as a tenant. (See generally, *City of Sunnyside* v. *Lopez*, *supra*, 751 P.2d at p. 318.)

Our holding is also consistent with precedent from other jurisdictions which have concluded their constitutions do not require state action and which, like California, have adopted a more expansive protectionist view of expressional freedom.[8]

---

[8]For example, courts have afforded public access for First Amendment activity in the following circumstances: *State* v. *Schmid* (1980) 84 N.J. 535 [423 A.2d 615] (the campus of Princeton University); *Shad Alliance* v. *Smith Haven Mall* (1983) 118 Misc.2d 841 [462 N.Y.Supp.2d. 344] (a 97-acre mall with over 125 retail, entertainment and service businesses and 7,000 parking spaces); *Alderwood Assoc.* v. *Wash. Envir. Council* (1981) 96 Wn.2d 230 [635 P.2d 108, 110] (a shopping mall with more than 1,000,000 square feet of store area on 110 acres of land), apparently overruled with regard to whether the free speech provision of the state Constitution protects an individual against actions of other private individuals and thus protects an individual only against state action in *Southcenter* v. *National Dem. Policy Com.* (1989) 113 Wn.2d 413 [780 P.2d 1282, 1291]. On the other hand, access has been denied in circumstances like we address: *Brown* v. *Davis* (1984) 203 N.J.Super. 41 [495 A.2d 900, 903-904], affirmed in *State* v. *Brown* (1986) 212 N.J.Super. 61 [513 A.2d 974] (a private medical facility which performs various gynecological services including abortions, one of ten tenants within a three-single-story building complex separated by common areas used for parking and vehicular ingress and egress to and from public roadways); *Planned Parenthood of Monmouth* v. *Cannizzaro* (1985) 204 N.J.Super. 531 [499 A.2d 535] (only tenant within a single building complex with adjacent parking); *City of Sunnyside* v. *Lopez*, *supra*, 751 P. 2d 313 (a three-building medical center on one and one-half acres of land with

We find the analysis in *Brown* v. *Davis, supra,* 495 A.2d 900, to be persuasive on similar facts. There, an antiabortion group sought to enjoin a prosecution for criminal trespass for entering the parking lot of a medical center to place antiabortion literature on a parked car. In that center, situated on two acres containing three single-story buildings separated by common areas used for parking, one tenant performed abortions while the others were various business enterprises offering services to the general public other than retail sales. The trial court concluded the owner had not sufficiently dedicated the property to public use so as to entitle individuals to access for speech activity, reasoning:

"The [Center] is not the functional equivalent of a suburban shopping center, which may be characterized as an alternative to an urban downtown shopping area where the public at large is invited. The Center is normally used by employees of tenants and prospective customers visiting specific businesses for the limited services made available to them. It is not a place to which a general consumer would go to shop for personal, household or general business merchandise." (*Brown* v. *Davis, supra,* 495 A.2d at p. 903.) On appeal, the reviewing court rejected the argument antiabortionists had a right to free speech activity on the center's property, declaring the private property bore no resemblance to a public forum and the center's invitation was clearly designed for private and personal purposes. (*State* v. *Brown, supra,* 513 A.2d at p. 977.)

The protesters rely on the holding of *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561]. We find this decision to be factually and legally distinguishable. In this decision issued 10 years before *Robins,* our Supreme Court extended the assurance of protected speech to economic picketers on a privately owned sidewalk of a grocery store. (*In re Lane, supra,* 71 Cal.2d at p. 878.) In *Lane,* union picketers involved in a labor dispute were attempting peaceably to distribute handbills urging customers not to patronize a large "super-market-type" grocery store occupying a 24,000-square-foot building which was fronted by a large parking lot extending 150 feet to the public street. Customers of the market entered and exited along a private sidewalk adjacent to the building. Relying on *Marsh* v. *Alabama, supra,* 326 U.S. 501 and *Food Employees* v. *Logan Plaza, supra,* 391 U.S. 308, our Supreme Court upheld unobstructive union picketing upon a privately owned sidewalk, declaring to not do so would create a "cordon sanitaire" around the business establishment in light of the parking lot buffer

approximately one hundred ten parking spaces and eleven tenants); see also *State* v. *Elliott, supra,* 548 A.2d 28 (a single facility isolated from any other buildings); *Right to Life Advo.* v. *Aaron Women's Cl., supra,* 737 S.W.2d 564 (upholding an injunction prohibiting antiabortion activists from entering or trespassing on the private parking lot of a five-story office building in which the women's health center leases space).

between the thoroughfare and the store entrance, effectively immunizing the supermarket from on-the-spot public criticism. The public sidewalk, running parallel to the public road having a posted speed limit of 40 miles per hour, was located approximately 150 to 280 feet from the store entrance. (*In re Lane, supra,* 71 Cal.2d at pp. 876-877.)

However, here, the public sidewalk is located immediately in front of the Medical Center. The single entrance to the parking lot intersects the public sidewalk where the protesters are permitted to demonstrate. Consequently, when Planned Parenthood's patients arrive in automobiles, they must traverse the sidewalk to enter the parking lot, at which time they are unlikely to fail to observe the protesters and understand their intended message. Once this perception or communication occurs, any patient wishing to further communicate with the protesters can do so. (*Right to Life Advo.* v. *Aaron Women's Cl., supra,* 737 S.W.2d at pp. 568-569.) They can simply accept the protesters' literature by rolling down their car windows, slow or stop on the street as they enter the driveway or, after parking their car, return to the sidewalk for a discussion.[9] Thus, the preliminary injunction does not deny a reasonable alternative channel of communication for the protesters to directly communicate their message to their targeted audience. (See *Chico Feminist Women's Health Center* v. *Scully, supra,* 208 Cal.App.3d at pp. 243-246, and cases cited therein; *Right to Life Advo.* v. *Aaron Women's Cl., supra,* 737 S.W.2d at p. 568-569.) Mindful that the right of free speech involves a guarantee of providing a forum so one may obtain and perhaps reach the minds of willing listeners, the protesters' exclusion from the parking lot has not deprived them of an ample opportunity within the traditional public forum of the public sidewalk to do so.[10]

---

[9]The protesters' reliance on *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionary Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921], and *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97 [434 P.2d 353], is similarly misplaced. In regard to the former, it like *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733], involved a large shopping center, the functional equivalent of a municipal center or public forum. Similarly, *Hoffman* involved the distributing of anti-Vietnam War leaflets in Union Station in Los Angeles, a spacious area open to the community as a center for rail transportation, housing a restaurant, snack bar, cocktail lounge and magazine stand and providing waiting room facilities for passengers and their friends and relatives, essentially evolving its character to be equivalent to that of a public street or park. (*In re Hoffman, supra,* 67 Cal.2d at pp. 847, 851; see *In re Lane, supra,* 71 Cal.2d at p. 877.)

[10]Having concluded the preliminary injunction was properly granted because the Medical Center use upon this private property does not constitute a sufficient dedication to public use so as to entitle individuals to access for First Amendment activity, we do not address the protesters' remaining contention the preliminary injunction was constitutionally overbroad.

## DISPOSITION

The order is affirmed.

Benke, J., and Froehlich, J., concurred.