[No. E008534. Fourth Dist., Div. Two. May 14, 1992.]

CITY OF NEEDLES, Plaintiff and Respondent, v.
ROBERT OLIN GRISWOLD et al., Defendants and Appellants.

1882

**COUNSEL**

Shaub, Williams & Regan, David R. Shaub and James C. Regan for Defendants and Appellants.

Best, Best & Krieger, Michael J. Andelson and Robert W. Hargreaves for Plaintiff and Respondent.

## Opinion

**McKINSTER, J.**—Two licensees of a golf course owned by the City of Needles appeal from a portion of a preliminary injunction which enjoins them from preventing the city from taking possession of and using their private personal property. Concluding that the injunction deprives the licensees of their property without constitutionally guaranteed just compensation, we modify the injunction by striking that invalid portion. As modified, the injunction is affirmed.

### Factual and Procedural Background

Pursuant to a written agreement, Robert Olin Griswold and River Horizon Golf Club, Inc. (hereinafter, collectively Griswold) were licensed to operate a golf course owned by the City of Needles (City). Under the license agreement, Griswold was obligated to provide whatever personal property was necessary to equip, operate, maintain, and supply inventory for the golf course and its attendant pro shop and restaurant. Some of that personalty was leased from the City, but the balance was to be purchased or otherwise obtained by Griswold.

The agreement was entered into on March 20, 1987, for an initial term of five years. Prior to the expiration of that term, the City was authorized to terminate the license, without cause, upon 180 days' notice. The City also had the ability to terminate the license for cause, in the event that Griswold failed to cure a default in his obligations after 30 days' notice of the existence of the breach. Finally, the agreement provided that "[a]ny controversy or claims arising out of or relating to this License, or the breach thereof, shall be settled by arbitration in accordance with the Rules of the American Arbitration Association . . . ."

In January of 1990, the City became dissatisfied with Griswold's management of the golf course, and elected to exercise its right to terminate the license without cause. On January 16, 1990, the City notified Griswold that the license would terminate in 180 days, which would expire on July 15, 1990.

While the 180-day period was running, the golf course continued to deteriorate. Believing that the physical damage to the course and the resulting loss of goodwill among golfers would soon be irreparable, the City

concluded that it could not wait for the 180-day notice period to run, and decided to seek immediate judicial relief.

An extraordinarily complicated chain of procedural events ensued, of which only certain aspects are pertinent to this appeal. On April 9, 1990, the City filed an action for declaratory relief, damages for breach of contract, an accounting, and injunctive relief in the justice court. On the same date, the City applied ex parte for a temporary restraining order (TRO) and an order to show cause (OSC) re preliminary injunction. After the justice court judge recused himself, a judge of the municipal court issued the TRO and OSC on April 11, 1990, restraining Griswold "[f]rom interfering with the CITY's immediate entry to the golf course for the purpose of operating and managing said golf course to the exclusion of defendants" and "[f]rom interfering with the CITY's immediate exclusive control over the CITY EQUIPMENT the subject of the EQUIPMENT LEASE between the City and defendants, or some of them." The TRO did not address the personal property belonging to Griswold which was used in the operation of the golf course.

After successfully defending against several intervening procedural attempts to prevent the enforcement of the TRO, the City took possession of the golf course on April 20, 1990. At the same time, it took possession of a variety of personal property belonging to Griswold, including 60 golf carts, modular building units, trucks, mowers, maintenance equipment, kitchen improvements, office machines, and parts and supplies.

Meanwhile, Griswold opened another front in the litigation. On April 10, 1990, citing the mandatory arbitration clause in the license agreement, Griswold filed a petition in superior court to compel arbitration and to stay the lower court proceedings. The hearing on that petition was set for May 3, 1990.

On May 2, 1990, when the City's order to show cause re preliminary injunction came on for hearing, the municipal court judge denied the application for the preliminary injunction, and dissolved the TRO. However, the City did not surrender possession of either the golf course or Griswold's personalty. Instead, the City immediately filed an ex parte application in Griswold's superior court action, seeking another TRO and OSC.

The superior court granted the City's request on May 3, 1990. This time, however, the TRO did not restrict itself to possession of the personal property which Griswold had leased from the City. Instead, it enjoined Griswold "[f]rom interfering with the City's continued exclusive control over the equipment, or personal property necessary to properly operate the

Needles Municipal Golf Course," apparently without regard to whether that personalty is owned by the City or by Griswold. The court also granted Griswold's petition to compel the City to arbitrate their dispute.

After the hearing on the OSC re preliminary injunction on May 31, 1990, the superior court took the matter under submission, and subsequently granted the request for the injunction on June 19, 1990. The formal order, signed July 3, 1990, repeated the same terms as the TRO, and thus allowed the City to assume possession of any "necessary" personalty, including that belonging to Griswold. The court ordered the City to pay any rental or lease payments due from Griswold to third party lessors during the period the City would be using Griswold's property, but refused to provide for any compensation to Griswold for the City's use of the personalty they owned outright or in which they had an equity interest. Instead, the court deferred all such issues to the arbitrator. Griswold filed a timely appeal from the preliminary injunction order.

## ISSUES ON APPEAL

Griswold challenges only that portion of the preliminary injunction which permits the City to assume possession of their personal property. In doing so, they contend that, by depriving them of possession of their personal property and awarding the use of that property, pendente lite, to the City, the effect of the injunction was to take his private property for public use. Griswold also argues that the trial court's decision to defer any attempt to determine the compensation to which Griswold was entitled for such use until the final judgment following arbitration violated his constitutional right to just compensation for such a taking.[1]

The issues presented by his appeal, therefore, are whether (1) there has been a taking of property from Griswold (2) for a public purpose (3) without the constitutionally required compensation. We answer each part of that question in the affirmative, and strike that portion of the preliminary injunction. For the guidance of the trial court, we also explain that, even if concurrent compensation had been paid or deposited, the preliminary injunction would still have been improper.

---

[1]Griswold also contends that the City was guilty of unclean hands and thus barred from obtaining equitable relief, that the City's refusal to submit the dispute to contractually mandated arbitration constituted a failure to exhaust administrative remedies, and that the trial court failed to properly balance the equities between the parties, and thus abused its discretion in granting a mandatory preliminary injunction. Our decision that the trial court's transference of Griswold's property to the City was unconstitutional renders resolution of these other issues unnecessary.

DISCUSSION

### A. WAS THERE A TAKING OF GRISWOLD'S PROPERTY?

The City concedes that one consequence of the issuance of the injunction "was a temporary transfer to the City of [Griswold's] personal property that was necessary to operate the golf course." While it never explicitly concedes that the transfer constituted a taking, it does not argue to the contrary. Instead, it focuses upon the issue of whether compensation had to be paid prior to or concurrently with that taking. Even in the absence of an express concession, however, it is clear that the City's possession and use of the personal property pending the trial on the merits—albeit temporary, preliminary, or interlocutory—is a taking.

#### 1. *A Temporary Deprivation of Property Rights Is a Taking.*

█ "[T]he Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*First Lutheran Church* v. *Los Angeles County* (1987) 482 U.S. 304, 318-319 [96 L.Ed.2d 250, 266, 107 S.Ct. 2378].) Nothing in the Constitution suggests that only those unfair burdens which are permanent are barred. To the contrary, " 'temporary' takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." (*Id.*, at p. 318 [96 L.Ed.2d at p. 266].)

#### 2. *A Deprivation of Property Rights Pendente Lite Is a Taking.*

█ A temporary taking ordered during the pendency of an action to determine whether the taking may be made permanent, enjoys no constitutional exception. That point was decided nearly a century ago in *Steinhart* v. *Superior Court* (1902) 137 Cal. 575 [70 P. 629]. "The main question" before the Supreme Court was whether a statute (Code of Civil Procedure former section 1254) which authorized a trial court in which a condemnation action was pending "to make an order that such plaintiff may 'take possession of and use the land and premises sought to be condemned, during the pendency and until the final conclusion of the proceedings brought to condemn,' is constitutional." (*Steinhart*, at p. 576.)

The condemnor contended that since actual title to the property would not pass until the proceedings concluded in a judgment, "taking possession and using the property during the pendency of the proceeding is not a taking,

within the meaning of the constitution." (137 Cal. at p. 577.) In concluding that the statute was unconstitutional, the court expressly rejected that proposition: "To hold that possession of land may be given to a person seeking to acquire a right of way by condemnation, during the pendency of the proceeding and before the amount of compensation has been determined and paid to the owner or into court for him, would be to hold that this so-called temporary possession is not a taking of private property for public use. But both on authority and reason it is so." (*Id.*, at p. 579.)

Here, of course, the action pending was not one for condemnation. However, that is not the only forum in which a taking may occur. "While the typical taking occurs when the government acts to condemn property in the exercise of its power of eminent domain, the entire doctrine of inverse condemnation is predicated on the proposition that a taking may occur without such formal proceedings." (*First Lutheran, supra,* 482 U.S. at p. 316 [96 L.Ed.2d at p. 265].) Since a taking can occur when there are no formal procedures, one can certainly occur in the scope of an action other than one for condemnation. "The physical invasion of private property is no less an invasion if it is authorized by the courts through the granting of a preliminary injunction . . . ." (*Cox Cable San Diego, Inc.* v. *Bookspan* (1987) 195 Cal.App.3d 22, 27 [240 Cal.Rptr. 407], fn. omitted.)

In short, an interlocutory order transferring possession of property from its owner to a public agency, even though made while an action was pending to determine the agency's right to assume title to that property, nevertheless constitutes a taking.

### 3. *The Duration of the Taking Was Not Insignificant.*

Conceptually, some uses of private property for the public good may be of such brief duration and of such little consequence to the owner that they do not impose any unfair burden, and thus do not rise to the level of takings. Similarly, the City attempts to minimize the magnitude of the taking here by arguing that, according to the license agreement, title to Griswold's personal property passed to the City when the license was terminated on July 15, 1990. That date being less than three months after the City took possession of that property, the desired implication appears to be that the deprivation of possession suffered by Griswold was of such short duration that it is insignificant.

There are at least two responses to that suggestion. First of all, it is by no means clear that the City's construction of the license agreement is correct. The City relies on paragraph 30(c), which provides in relevant part that

"[a]ny and all appliances, furniture, furnishings, equipment (other than trade fixtures [which are covered by a separate paragraph]), and other items of personal property on said golf course, now there present or later becoming present there, shall at License expiration or termination, become owned by City, at City's option. Such items shall be City's free of all liens and claims except as otherwise provided in this License."

However, the City fails to acknowledge paragraph 30(f) on the next page of the agreement: "Notwithstanding any of the foregoing, if Griswold desires to dispose of any of its personal property used in the operation of said golf course upon expiration or termination of this License, then City shall have the first right to acquire or purchase said personal property." Similarly, paragraph 45 refers to the City's "first right to purchase" the furnishings of the golf course if Griswold chooses to sell them.

While these provisions are clear and unambiguous when read in isolation, paragraph 30(c) appears to be irreconcilable with paragraphs 30(f) and 45: Why would the City need to purchase Griswold's personal property if title to all of such property had passed to the City? Extrinsic evidence may be introduced at trial to resolve the ambiguity which results from that inconsistency. In the absence of that evidence, however, paragraphs 30(f) and 45 would have to be given effect over paragraph 30(c), pursuant to the rule that ambiguities are resolved "against the party who caused the uncertainty to exist." (Civ. Code, § 1654.) The license agreement was obviously drafted by the City. Thus, it would appear that the City has retained Griswold's property for over two years, not merely three months.

Second, even assuming that the City's construction of the license agreement is correct, from the current state of the record it would be unreasonable to conclude that the City's use and possession of Griswold's property for nearly three months was so brief and of so little detriment to Griswold as to be de minimis. Thus, Griswold's constitutional challenge cannot be defeated solely upon the alleged brevity of the deprivation of possession.

B. WAS THE PROPERTY TAKEN FOR PUBLIC USE?

█ " 'Public use' within the meaning of [the Constitution] is defined as a use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." (*Bauer* v. *County of Ventura* (1955) 45 Cal.2d 276, 284 [289 P.2d 1].) There can be little doubt that Griswold's property was being taken for a public use. The City did not justify its request for the preliminary injunction solely on its proprietary interest as the owner of the golf course, or on its contractual rights under the

license agreement. Instead, it repeatedly emphasized the harm that would flow to the community as a whole if the injunction were not granted.

For instance, it alleged and presented evidence that the golf course was the City's primary recreational resource and an important tourist attraction, particularly for winter "snowbirds." If the deteriorated condition of the golf course caused those tourists to go elsewhere, the City's tourist industry would suffer for years. In particular, revenue would be lost by "local retail establishments, including places of lodging, food and general merchandise stores." The cumulative effect would be long-term damage to the reputation of the City as a destination resort. It continues to advance those same contentions on appeal.

## C. WAS THE PROPERTY TAKEN WITHOUT CONSTITUTIONALLY REQUIRED COMPENSATION?

■ "Eminent domain is the power of government to take private property for public use." (*County of San Diego* v. *Miller* (1975) 13 Cal.3d 684, 687 [119 Cal.Rptr. 491, 532 P.2d 139].) "[A]s one of the indisputable attributes of sovereignty" (*Bauer* v. *County of Ventura, supra,* 45 Cal.2d at p. 282), it is an inherent power of the state (*County of San Diego* v. *Miller, supra,* at p. 687). While cities do not inherently possess the power of eminent domain (*City & County of San Francisco* v. *Ross* (1955) 44 Cal.2d 52, 55 [279 P.2d 529]), it has been expressly conferred upon them by statute (Gov. Code, § 37350.5).

■ The exercise of this power is subject to constitutional limitations. (*Rose* v. *State of California* (1942) 19 Cal.2d 713, 719 [123 P.2d 505].) The Fifth Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment, conditions the power of eminent domain upon the payment of "just compensation." That constitutional requirement makes no distinction between real property and personal property. If personal property is taken by the government in the exercise of its eminent domain power, it must compensate the owner. (*Baldwin Park Redevelopment Agency* v. *Irving* (1984) 156 Cal.App.3d 428, 435 [202 Cal.Rptr. 792].)

■ The City admits that it may be required to compensate Griswold for the value of his property, or at least the value of its interim use of his property. In dispute is the timing of that compensation. Griswold contends that payment of compensation must be made concurrently with the order permitting the taking. The City, on the other hand, argues that the determination and payment of the compensation due may be deferred until final judgment after trial (or in this case, arbitration). Griswold is correct.

### 1. *The California Constitution Requires That Compensation Be Either Paid or Deposited Before the Taking.*

While the federal Constitution does not expressly state when compensation is to be paid with respect to a taking, California's constitution does: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has *first* been paid to, or into court for, the owner." (Cal. Const., art. I, § 19, italics added.) To this general rule requiring payment in advance, the Constitution permits one exception: "The Legislature may provide for possession by the condemnor following commencement of eminent domain proceedings upon deposit in court and prompt release to the owner of money determined by the court to be the probable amount of just compensation." (*Ibid.*) The Legislature has enacted such provisions. (Code Civ. Proc., §§ 1255.010-1255.480.)

Thus, the Constitution presents a public agency with two alternative courses of action before it may exercise its power to take private property for public benefit. First, it may comply with the general rule by trying the action before a jury, allowing the jury to determine the amount of compensation due to the property owner, and taking possession only after that sum has been paid to the owner (or deposited it into court if the owner is appealing). Second, it may avail itself of the right to file a condemnation action, ask the court to estimate the probable amount of compensation which will be found to be due at trial, deposit that sum with the court for the owner's benefit, and take immediate possession of the property while that action is pending.

Here, the City took possession without trying the issue of compensation, and without making any deposit of probable compensation into court. Since it took Griswold's property without complying with either of the only two constitutionally authorized means of compensating him for the taking, its possession of his property is unconstitutional. The preliminary injunction must be modified to delete that portion which forced a transfer of possession of that property to the City.

### 2. *There Is No Exception for Temporary Takings.*

The City argues that it is excused from these constitutional limitations on its eminent domain power because, until foundational issues such as the ownership of the personal property upon termination of the license agreement are tried, the total amount of compensation due cannot be finally adjudicated. However, the courts of this state have long held that compensation must be paid in advance, even if the property interest taken is mere possession rather than title.

The Constitution of 1849 specified only that private property could not "be taken for public use without just compensation." (Cal. Const. of 1849, art. I, § 8.) While that provision did not expressly provide when that compensation was to be paid in relation to the timing of the taking, it was interpreted to mean "that such compensation must be made before the citizen can be divested of his rights." (*San Francisco* v. *Scott* (1854) 4 Cal. 114, 116.) "It is, then, the settled law, that the compensation, or the offer of it, must proceed [*sic*] or be concurrent with the seizure and entry upon private property of the citizen." (*McCauley* v. *Weller* (1859) 12 Cal. 500, 531 (conc. opn. of Field, J.); accord, *Gillan* v. *Hutchinson* (1860) 16 Cal. 153, 156 ["compensation must precede or accompany the taking"].) At the very least, prior to taking possession, the public agency must have established a fund "out of which compensation shall be made, so soon as the amount can be determined." (*McCann* v. *Sierra County* (1857) 7 Cal. 121, 123.)[2]

The requirement that the compensation precede the taking was expressly stated in the Constitution when it was revised in 1879: "Private property shall not be taken or damaged for public use without just compensation having been *first* made to, or paid into Court for, the owner, and no right of way shall be appropriated to the use of any corporation other than municipal until full compensation therefor be first made in money or ascertained and paid into Court for the owner, irrespective of any benefit from any improvement proposed by such corporation, which compensation shall be ascertained by a jury, unless a jury be waived, as in other civil cases in a Court of record, as shall be prescribed by law." (Cal. Const. of 1879, art. I, former § 14, italics added.)

The effect of the new constitutional language was explained and applied to a temporary taking of possession in *Steinhart* v. *Superior Court, supra*, 137 Cal. 575. As discussed above, at issue was the constitutionality of Code of Civil Procedure former section 1254, which at that time permitted a condemning agency, even before trial, "to take possession of and use the land and premises sought to be condemned, during the pendency and until the final conclusion of the proceedings brought to condemn the same," if the agency would first deposit "a sufficient sum of money into court, or give security for the payment thereof, to be approved by the judge of such court, to compensate said defendant for all damages which may be sustained by

---

[2]The interpretation that the Constitution required compensation to be paid before the owner's possession was disturbed was subsequently challenged in *Fox* v. *W.P. Railroad Co.* (1867) 31 Cal. 538, in which the broad pronouncements of the earlier cases were dismissed as dicta. The *Fox* court held that while compensation must be determined and paid before *title* to the property would pass to the public (*id.*, at p. 546), the Constitution did not require that compensation be paid before the government *seized possession* (*id.*, at p. 553). However, that distinction was abandoned in *Davis* v. *San Lorenzo R. R. Co.* (1874) 47 Cal. 517.

said defendant by reason of such proceedings, or of any such condemnation . . . ." (Stats. 1897, ch. 127, § 1, p. 187.) That deposit could be withdrawn by the owner only after entry of judgment. (*Ibid.*)

As previously discussed, the court held that the occupation of property prior to the judgment in the condemnation proceedings " 'is a taking of the property within the meaning of the constitution.' " (*Steinhart, supra*, 137 Cal. at p. 577.) It then went on to hold that the "obvious" meaning of the Constitution was that such preliminary possession "cannot be authorized until the damage resulting therefrom has been judicially determined and the amount has been paid or tendered to the owner." (*Id.*, at p. 578.) Since the statute required that the deposit be held as security instead of being released to the owner, it violated that constitutional guarantee of compensation before possession. (*Id.*, at p. 579.)

The type of prejudgment possession which the Legislature attempted to authorize by Code of Civil Procedure former section 1254 was subsequently sanctioned when the Constitution was again amended in 1918. (*People* v. *Peninsula Title Guar. Co.* (1956) 47 Cal.2d 29, 33 [301 P.2d 1].) That amendment, however, like the current language of our Constitution, permitted such possession only if the condemnor deposited a sum determined by the court to be reasonably adequate to compensate the property owner for the loss of or damage to his property. (Cal. Const., art. I, former § 14, amended Nov. 5, 1918.)

Here, as we have seen, the City made no such deposit, and thus failed to satisfy the prerequisites for the application of that exception. Accordingly, the City's claimed right to prejudgment possession must be evaluated, not by the unavailable exception, but by applying the general rule: i.e., that an agency may not take even temporary, pendente lite possession until compensation has been paid. (*Steinhart, supra*, 137 Cal. at p. 579.) When measured against that standard, the invalidity of the preliminary injunction is clear.

D.  THE STATUTORY RIGHT TO PREJUDGMENT POSSESSION MAY NOT BE EXERCISED EXCEPT THROUGH A CONDEMNATION ACTION.

As noted above, by authorizing the City to take possession of Griswold's property without immediate compensation, the injunction contravened the constitutional limitations on the City's eminent domain power, and is thus invalid. No further discussion is necessary for our disposition. However, we do not want to leave the trial court with the mistaken impression that the constitutional deficiency in the injunction can be cured by requiring the City to deposit some reasonable estimate of the compensation owed to Griswold for the use of his property. Even if the City were to

make such a deposit, the injunction would still be improper, because the law does not permit a public agency to take private property for public use by means of a preliminary injunction.

In *Jacobsen* v. *Superior Court* (1923) 192 Cal. 319 [219 P. 986, 29 A.L.R. 1399], a water district had entered onto certain real property, with the owners' consent, to survey that property and determine its suitability as a reservoir site. (*Id.*, at p. 321.) Thereafter, the district requested further permission to bore holes and make excavations to evaluate the characteristics of the subsurface strata. The owners denied the request. (*Id.*, at p. 322.) The district then filed an action for injunctive relief, alleging that while no condemnation proceedings had been either authorized or initiated, excavations were necessary to determine whether the property was suitable for purchase by the district as a reservoir site. The trial court granted a preliminary injunction, enjoining the owners from preventing the district from entering on the property and making specified excavations, but conditioned the issuance of the injunction upon the district posting a $1,000 bond as security against any damages the excavations would cause. (*Id.*, at pp. 322-324.)

In granting the owners' petition for a writ of prohibition, the Supreme Court held: "The only legal procedure provided by the constitution and statutes of this state for the taking of private property for a public use is that of a condemnation suit which the constitution expressly provides must *first* be brought before private property can be taken or damaged for a public use." (*Jacobsen* v. *Superior Court, supra,* 192 Cal. at p. 331.) While the Constitution permits a plaintiff in a condemnation action to take immediate possession upon making a proper deposit, that "exception only serves to emphasize the otherwise general rule that no court in any other action or proceeding than an action in eminent domain has jurisdiction to order the taking or damage of private property for a public use." (*Ibid.*)

Like the water district in *Jacobsen,* the City chose not to seek the possession and use of the private property through an action for condemnation. Instead, it attempted to do so through the means of a preliminary injunction in an action for declaratory relief and breach of contract. The difference between those two types of actions cannot be cavalierly disregarded. "The proceeding to condemn land for a public use is special and statutory and the prescribed method in such cases must be strictly pursued" (*Harrington* v. *Superior Court* (1924) 194 Cal. 185, 191 [228 P. 15]), especially if those methods benefit the owner (*City of Los Angeles* v. *Glassell* (1928) 203 Cal. 44, 46 [262 P. 1084]).

In short, in the absence of a pending condemnation proceeding, the trial court has no power to grant the relief which the City desires. (*Jacobsen,*

*supra*, 192 Cal. at p. 331.) Therefore, even if the trial court were to consider and determine the probable amount of compensation, and even if the City were to deposit that sum into court for Griswold, the preliminary injunction would still be invalid.

## DISPOSITION

The preliminary injunction is modified by striking paragraph E thereof, which purports to enjoin the appellants "[f]rom interfering with the City's continued exclusive control over the equipment, or personal property necessary to properly operate the Needles Municipal Golf Course." As modified, the preliminary injunction is affirmed.

■ "The taking of private property before the amount of the compensation is ascertained will be enjoined . . . ." (*Felton Water Co.* v. *Superior Court* (1927) 82 Cal.App. 382, 387 [256 P. 255].) Accordingly, upon the issuance of the remittitur in this action, the trial court shall immediately order the City to cease its possession or use of any personal property belonging to the appellants, or either of them, and to surrender possession of all such property to the appellants. (Cf. *Marblehead L. Co.* v. *Superior Court* (1923) 60 Cal.App. 644, 653 [213 P. 718].) Appellants shall recover their costs on appeal.

Ramirez, P. J., and Hollenhorst, J., concurred.