[No. A116935. First Dist., Div. Two. Feb. 28, 2008.]

CITY OF FREMONT, Plaintiff, Cross-defendant and Appellant, v. GEORGE W. FISHER et al., Defendants, Cross-complainants and Respondents.

## Counsel

Erickson, Beasley & Hewitt, John H. Erickson, Henry S. Hewitt, Dante Foronda and Tracy E. Dickinson for Plaintiff, Cross-defendant and Appellant.

George W. Fisher, Elizabeth Lee Fisher; Timken Johnson Hwang, Heidi A. Timken, Elizabeth K. Hwang; Law Offices of David M. O'Hara and David M. O'Hara for Defendants, Cross-complainants and Respondents.

## Opinion

**LAMBDEN, J.**—The City of Fremont (Fremont) filed a complaint in eminent domain against George W. Fisher and Elizabeth Lee Fisher (collectively, the Fishers), the owners of property located in Fremont. The Fishers filed a cross-complaint to quiet title and for equitable relief. The matter proceeded to a jury trial on the question of the amount of just compensation Fremont owed the Fishers. The jury awarded the Fishers compensation in the total amount of $403,513. The damages included the fair market value of the temporary construction easement (TCE), the value of the permanent slope easement, the permanent severance damages resulting from the permanent slope easement, and the temporary severance damages from the TCE. With respect to temporary severance damages, the jury awarded $195,413. Subsequently, the trial court awarded the Fishers their litigation expenses pursuant to Code of Civil Procedure section 1250.410.[1]

---

[1] All further unspecified code sections refer to the Code of Civil Procedure.

Fremont appeals the portion of the final judgment awarding $195,413 to the Fishers for the temporary severance damages from the TCE; it also appeals the trial court's award of litigation expenses to the Fishers. Fremont mounts several challenges to the award of temporary severance damages for the TCE, including an argument that the trial court should have excluded the testimony of the Fishers' expert on temporary severance damages because the Fishers failed to show that the TCE interfered with their actual intended use of the property. We agree with this latter argument and reverse the award of temporary severance damages for the TCE. Additionally, since we are reversing a significant portion of the damages award and the trial court based its award of litigation expenses to the Fishers on its assessment of the disparity between the damages awarded by the jury and Fremont's final offer of settlement, we remand to allow the lower court to reconsider the award of litigation expenses in light of this opinion.

## BACKGROUND

*Fremont's Eminent Domain Action and the Fishers' Cross-complaint*

Since 1988, the Fishers have owned real property measuring 6,846 square feet, which abuts Washington Boulevard in Fremont (the property or the Fishers' property). The property has a three-bedroom home that was constructed in 1985. Excluding the garage, the house is 1,867 square feet. The house shares a driveway with the neighbor.

Fremont is constructing the Washington/Paseo Padre Parkway Grade Separation Project along Washington Boulevard (the project). To complete the project, Fremont needed to acquire from the Fishers' property a TCE of 1,873 square feet.

On January 20, 2004, Fremont made an offer of probable just compensation pursuant to Government Code section 7267.7 to the Fishers in the amount of $14,250 for acquisition of the TCE. The Fishers, who did not have legal counsel at the time, rejected the offer, and countered with a request of compensation in the amount of $55,000. Fremont rejected the Fishers' counter proposal.

On October 22, 2004, Fremont filed a complaint in eminent domain against the Fishers and a home developer. Among other things, Fremont sought to acquire the TCE. Fremont alleged: "The [TCE] . . . will expire on August 31, 2007, and is being acquired for the purposes of constructing the Project and related improvements, including modifications to the owner's property to preserve access to Washington Boulevard, and shall include the right to enter

upon the property with personnel, vehicles and equipment by the City, its agents, employees and contractors."

Fremont also sought immediate possession of the portion of the property containing the TCE, which the trial court granted. The court issued its order on January 25, 2005, which stated in pertinent part: "It is further ordered that plaintiff is authorized and empowered to enter upon and take immediate possession and use of the property rights described in the complaint for those purposes set forth in the complaint, and to remove therefrom any and all persons, obstacles, improvements or structures of every kind or nature situated thereon and to fully possess and use said property rights for the purposes set forth in the complaint. This order for possession shall be effective on April 26, 2005 . . . ."

On August 15, 2005, the Fishers filed a cross-complaint against Fremont, and amended it on November 1, 2005. In their first amended cross-complaint, the Fishers alleged a cause of action to quiet title based on an agreed boundary and for equitable relief.

Fremont adopted an amended resolution of necessity and filed its first amended complaint in eminent domain on July 20, 2006. In this pleading, it requested a permanent slope easement and extended the expiration of the TCE from August 31, 2007, to December 31, 2009. In the pleading, Fremont alleged with respect to the TCE: "The [TCE] . . . is being acquired for the purpose of constructing the Project and related improvements, including modifications to the owner's property to preserve access to Washington Boulevard, and shall include the right to enter upon the property with personnel, vehicles and equipment by the City, its agents, employees and contractors. The duration of said [TCE] extends to August 31, 2007, and will continue thereafter on a month to month basis and will expire upon completion of the Project, or December 31, 2009, whichever is sooner."

On September 20, 2005, the Fishers made an offer to compromise to Fremont in the amount of $175,000, and Fremont rejected this settlement offer. On September 29, 2006, the Fishers made a final statutory demand pursuant to section 1250.410 of $320,000 to settle the matter, which Fremont rejected. Shortly thereafter, on September 29, 2006, and pursuant to section 1250.410, Fremont made its final offer of compensation in the amount of $100,500, plus $1,334 payable monthly from August 31, 2007, until completion of the project or December 31, 2009, whichever occurred first. The Fishers declined this offer.

*Pretrial Motions and Hearings*

Fremont filed a motion in limine to exclude the testimony of the Fishers' expert real estate appraiser Kurt Louis Reitman. Reitman was going to testify,

among other things, about the value of the temporary severance damages resulting from the TCE. Fremont argued that Reitman's analysis lacked foundation and was based on an improper methodology. At the hearing on the motions in limine on October 16, 2006, the trial court asked the Fishers' attorney what the loss to the Fishers would be if the property increased in value and would be worth more when the TCE expired. Counsel responded that the loss was the owners' "inability to sell the property all during this time." At the end of the hearing, the court denied Fremont's motion, explaining that it needed the appraiser and then it could determine "whether or not his analysis is sufficiently sound to go forward." The court further explained that it wanted to hear from Reitman in the nature of an Evidence Code section 402 hearing.

Fremont also moved to bifurcate the issue of entitlement to temporary severance damages. The court decided to conduct an Evidence Code section 402 hearing regarding Reitman's methodology and whether the TCE would be a substantial impairment to the remainder of the Fishers' property.

The following day, on October 17, 2006, the court held the Evidence Code section 402 hearing and Reitman and one of Fremont's engineers, Afshin Abtahi, testified. Reitman testified that the TCE comes within 6.85 feet of the Fishers' residence. He stated that it was his understanding that Fremont had the right to have its workers come onto the easement and bring its equipment on the easement in the process of doing the slope easement or any work associated with the Washington Boulevard overpass. Reitman testified extensively about the method he used to calculate the temporary severance damages resulting from the TCE.

At the close of the hearing, the trial court ruled as follows: "The court finds that on a more-likely-than-not basis there is a substantial impairment to the remainder of the defendants' property. [¶] Mr. Reitman's testimony is credible when he opines that the property when encumbered by the temporary construction easement could only be sold at a deep discount. [¶] As to the evaluation of the impairment to the remainder, the court finds that the methodology used by Mr. Reitman is basically sound and is admissible for the jury to consider and evaluate."

*The Trial*

The jury trial began on October 18, 2006. The only witnesses to testify were Reitman, Abtahi, and Greg Rinehart, Fremont's real estate appraiser. The Fishers did not testify.

Reitman prepared a TCE analysis, which was submitted as an exhibit during the trial; he testified about his analysis. Reitman told the jury that the

market value of the property was worth $207,664 less to a buyer with the TCE burdening the property. He testified that this is considered "temporary severance damages." In arriving at his conclusions, Reitman noted that the TCE comes within about six feet of the Fishers' home and that Fremont can block the driveway, put its construction equipment anywhere within the easement area, tear out any and all improvements within the same area, and make many other uses of the area throughout the five-year period.

Reitman opined that the highest and best use of the property was to tear down the existing home and replace it with a new single-family residence. He stated that the TCE would preclude development to this highest and best use from 2004 to 2009, the period the TCE was in use, and therefore the property would suffer severance damage. Reitman determined that the severance damages based on not being able to develop the property were $207,664.

In arriving at the damage figure of $207,664, Reitman used comparable sales to assist in his determination of the highest and best use of the property. He used those comparisons when calculating that the overall property value was equivalent to $90 per square foot in 2005. He projected that this value would increase by 12 percent each year between 2005 and 2009. He arrived at the annual return and deducted real estate taxes, expenses, and the rent for the current property with the TCE. He then determined the net revenue loss.

Thus, for example, for the period of October 6, 2004, until October 5, 2005, Reitman multiplied the $90 per square foot times the total square feet of the land and the rental factor of 8.5 percent (90 x 6,846 x 8.5% = $52,371.90).[2] He took the product of $52,371.90 and then added $6,997.06 for real estate taxes and added $1,000 for expenses. He then deducted $17,460 for the rental offset for the existing house. The final net revenue loss was $42,908.96. He calculated the net revenue loss as $48,839.73 for the 12-month period ending in 2006, $55,512.64 for the 12-month period ending in 2007, $63,017.80 for the 12-month period ending in 2008, $90,603.46 for the 12-month period ending on October 5, 2009, and $19,147.30 for the period between October 5 and October 31, 2009.

Reitman discounted the projected net compensation due because of the TCE at a rate of six percent, which reflected the opportunity cost of funds to the property owner. He calculated the opportunity value of the property as $262,485 and deducted $54,821 for the compensation for the TCE. He determined that the temporary severance damage from the TCE was $207,664.

---

[2] Fremont challenges many of the values used by Reitman, such as the amount for rent, as lacking a proper foundation.

Fremont's appraiser, Rinehart, testified that he found no TCE severance damage. He opined that the property had already achieved its best use. He spoke to an unidentified developer who told him that he was not "influenced or concerned about the construction easement" burdening his property. He testified that Fremont did not intend to use the TCE until late in the TCE period. He added that the TCE was to be used only to rebuild the Fishers' driveway and to reconnect it to the new elevation of Washington Boulevard. Fremont, according to Rinehart, needed the right to use the TCE for the five-year period, but the TCE would be used only for a short period of time near the end of the five-year period.

*The Jury Verdict*

The jury returned its verdict on October 24, 2006. The jury found that the fair market value of the TCE from October 6, 2004, to the end of the project was $84,352. The jurors calculated the temporary severance damages to the remainder of the Fishers' property from the TCE valued as of October 6, 2004, to be $195,413. They further determined that the fair market value of the slope easement on the date of trial was $15,500. They found the permanent severance damages to the remainder of the Fishers' property from the project on the date of trial to be $108,248.

The judgment in condemnation was filed on November 6, 2006, and the Fishers were awarded the sum of $403,513.

*Fremont's Posttrial Motions*

Fremont moved for a new trial, arguing that insufficient evidence supported the verdict and that Reitman's testimony was inadmissible for lack of foundation and improper methodology. It also moved for judgment notwithstanding the verdict with regard to the jury's verdict on temporary severance damages. The court denied both of Fremont's motions.

*The Fishers' Request for Litigation Expenses*

The Fishers requested litigation expenses pursuant to section 1250.410 on the grounds that Fremont's statutory final offer was unreasonable and that the Fishers' statutory final demand was reasonable in light of the evidence adduced at trial and the compensation awarded by the jury. Fremont opposed the motion and claimed that it made its offer in good faith.

The trial court granted the Fishers' motion and awarded litigation expenses consisting of attorney's fees in the amount of $109,200, expert witness fees

in the amount of $61,696, and costs in the amount of $3,535.84. The court also awarded the Fishers $16,200 in attorney's fees for presenting the motion for litigation expenses.

The Fishers also moved for postjudgment litigation expenses based on the court's denial of Fremont's motions for new trial and for judgment notwithstanding the verdict. The court awarded $39,927.95 to the Fishers for opposing and prevailing against Fremont's posttrial motions.

*Appeal*

Fremont filed a timely notice of appeal from the judgment, the orders on its postjudgment motions, and from the order awarding the Fishers litigation expenses pursuant to section 1250.410.

## DISCUSSION

### I. *The Award of Temporary Severance Damages*

Fremont mounts several challenges to the award of temporary severance damages. It maintains that Reitman, the Fishers' expert, should not have been permitted to testify because he used an improper methodology and his methodology resulted in a windfall to the Fishers. Additionally, it asserts that Reitman's calculations were purely speculative and his assumptions about the project as proposed were improper as a matter of law. Fremont also maintains that Reitman's opinion was not supported by substantial evidence.

After Fremont filed its opening brief, but prior to the Fishers' filing their opening brief, the Supreme Court issued its decision in *Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954 [62 Cal.Rptr.3d 623, 161 P.3d 1175] (*Metropolitan Water*). Fremont requested permission to file a supplemental letter brief to address the effect of the Supreme Court's recent decision on the present case. We granted this request, and Fremont argued that *Metropolitan Water* reconfirmed that the lower court had improperly permitted Reitman to testify about temporary severance damages because the Fishers provided no evidence of actual injury. We agree and reverse on this basis.[3]

---

[3] Since we are reversing on this basis, we need not address Fremont's other contentions that Reitman employed a flawed methodology, that Reitman's testimony was based on speculation and improper assumptions, or that Reitman's opinion was not supported by substantial evidence. Additionally, we do not consider Fremont's argument that the award of temporary severance damages resulted in a windfall to the Fishers, although we note that the Fishers never responded to this argument.

## A. *The Relevant Law*

■ This is an eminent domain case arising under article I, section 19 of the California Constitution, which requires the owner whose property is taken or damaged for a public use be paid "just compensation, ascertained by a jury unless waived." The Legislature has defined the measure of just compensation as the "fair market value of the property taken." (§ 1263.310.) "The fair market value of the property taken is the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).) "As section 1263.320 indicates, the fair market value of property taken has not been limited to the value of the property as used at the time of the taking, but has long taken into account the 'highest and most profitable use to which the property might be put in the reasonably near future, to the extent that the probability of such a prospective use affects the market value.' " (*City of San Diego v. Neumann* (1993) 6 Cal.4th 738, 744 [25 Cal.Rptr.2d 480, 863 P.2d 725].)

■ Section 1263.410, subdivision (a) provides that an owner is to be compensated when the property taken is part of a larger parcel and the compensation is not merely for the injury to the part taken but also for the injury, if any, to the remainder. Compensation for the injury to the remainder is the amount of the damage to the remainder caused by the taking, reduced by the amount of the benefit to the remainder caused by the taking. (§ 1263.410, subd. (b).) Such compensation is commonly called "severance damages." (*City of San Diego v. Neumann, supra*, 6 Cal.4th at p. 741.) Thus, permanent severance damages "consist generally of the diminution in the fair market value of the remainder property caused by the project." (*Metropolitan Water, supra*, 41 Cal.4th at p. 970.) " 'Severance damages are not limited to special and direct damages, but can be based on *any factor*, resulting from the project, that causes a decline in the fair market value of the property.' [Citation.]" (*Id.* at p. 971.)

■ Temporary severance damages resulting from the construction of a public project are also compensable. (*Metropolitan Water, supra*, 41 Cal.4th at p. 975.) A property owner "generally should be able 'to present evidence to show whether and to what extent the delay disrupted its use of the remaining property.' " (*Ibid.*) However, "the mere fact of a delay associated with construction" does not, without more, entitle the property owner to temporary severance damages. (*Ibid.*) The temporary easement or taking must interfere with the owner's *actual* intended use of the property. (*Ibid.*, see also *Placer*

*County Water Agency v. Hofman* (1985) 165 Cal.App.3d 890, 894 [211 Cal.Rptr. 894] [agency's temporary easement "substantially prevented use of the property" for its actual intended use, which was to use the property for cattle and sheep].)

B. *Standard of Review, Role of the Court, and Burden of Proof*

Fremont contends that its challenge to the valuation methodology used by Reitman is a question of law and subject to de novo review. (See *Huson v. County of Ventura* (2000) 80 Cal.App.4th 1131, 1134 [96 Cal.Rptr.2d 116]; *Service America Corp. v. County of San Diego* (1993) 15 Cal.App.4th 1232, 1235 [19 Cal.Rptr.2d 165].) The Fishers respond that we should review the trial court's decision to admit Reitman's testimony under the abuse of discretion standard. (See, e.g., *City of San Diego v. Sobke* (1998) 65 Cal.App.4th 379, 396 [76 Cal.Rptr.2d 9] [trial court has discretion to rule on admissibility of valuation methods employed by experts in condemnation matters].) The cases cited by Fremont are tax appraisal cases; neither *Huson* nor *Service America Corp.* concerns condemnation or eminent domain. These cases are inapplicable and we agree that the proper standard of review is abuse of discretion.[4] However, we examine whether the trial court properly permitted the jury to consider the issue of severance damages as a matter of law. (See *Metropolitan Water, supra*, 41 Cal.4th at p. 971.) Thus, the court abuses its discretion as a matter of law if it permits the jury to consider severance damages if the property owner is not entitled to severance damages as a matter of law.

"In condemnation proceedings, the trial court is vested with considerable judicial discretion in admitting or rejecting evidence of value. [Citation.]" (*Redevelopment Agency v. Contra Costa Theatre, Inc.* (1982) 135 Cal.App.3d 73, 86 & fn. 6 [185 Cal.Rptr. 159].) "Under this standard, we will not reverse a trial court's ruling if it was 'based on a "reasoned judgment" and complies with . . . ". . . legal principles and policies appropriate to the particular matter at issue." [Citations.]' [Citation.] Rather, we will only overturn the court's decision if it ' "exceeds the bounds of reason, all of the circumstances before it being considered." ' [Citation.]" (*City of San Diego v. Rancho Penasquitos Partnership* (2003) 105 Cal.App.4th 1013, 1027 [130 Cal.Rptr.2d 108].) "Where it appears that the opinion of a valuation witness is based upon considerations which are proper as well as those which are not, the testimony may be admitted and the trier of fact shall determine its weight and credibility." (*Ventura County Flood Control Dist. v. Security First Nat. Bank* (1971) 15 Cal.App.3d 996, 1004 [93 Cal.Rptr. 653].)

---

[4] In its reply brief, Fremont does not dispute that the abuse of discretion standard applies, but maintains that de novo or the abuse of discretion standard will have the same result.

■ In eminent domain actions, " 'all issues except the sole issue relating to compensation . . . are to be tried by the court.' " (*Metropolitan Water, supra*, 41 Cal.4th at p. 965.) The court is to consider all issues of law and mixed issues of law and fact. (*Id.* at pp. 971, 973.) The "entitlement to severance damages is for the court and only the amount thereof is [an issue of fact] for the jury . . . ." (*Id.* at p. 971.) " 'The jury is entitled to and should consider those factors which a buyer would take into consideration in arriving at a fair market value, were [the buyer] contemplating a purchase of the property.' " (*Id.* at p. 972.) As long as the foregoing factors on market value are "not conjectural, speculative, or remote, it is for the *jury* to decide the extent to which they may affect the value of the property." (*Ibid.*)

■ Unless otherwise specified by statute, "neither the plaintiff nor the defendant has the burden of proof on the issue of compensation." (§ 1260.210, subd. (b); *Metropolitan Water, supra*, 41 Cal.4th at p. 966.) The property owner, however, has the burden of production, "which is merely the burden of going forward with (or producing) some evidence of a material fact." (*Metropolitan Water, supra*, at p. 969.)

## C. *Evidence of an Actual Injury Resulting from the TCE*

At trial, Reitman testified that a hypothetical buyer in the marketplace was a person who would purchase the Fishers' property for development to its highest and best use. The highest and best use was to remove the existing home and develop a new, larger home. However, Reitman opined that the TCE, which comes within about six feet of the Fishers' house, would prevent this best use for the five-year period it was in existence. Thus, Reitman concluded that the hypothetical buyer would pay substantially less for the property on the date of valuation than the buyer would pay were the TCE not burdening the property. He testified that this difference is severance damage and in the present case it equaled $207,664. Reitman testified that, because of the project and the imposition of the TCE, the property owners lost the "opportunity value of this investment" during the period of the TCE.

In coming to his conclusions, Reitman used comparison sales to determine the best use of the land and concluded that the best use was an improved home. He used the same comparisons to arrive at his $90 per square foot value conclusion. He used a rental factor and other calculations that a buyer in the marketplace would use to determine how much to pay for the property. He then determined what price a buyer would pay for the property, which reflected the foregoing factors, and discounted the price to reflect the present day (date of valuation) value of the property.

The jury heard Reitman's testimony regarding his calculation of temporary severance damages, but the initial question we must answer is whether the

trial court should have permitted evidence of valuation to be submitted to the jury. We conclude that, under the holding of *Metropolitan Water, supra*, 41 Cal.4th at pages 974 through 975, the trial court did not properly apply the rules of law when it permitted evidence on temporary severance damages despite the Fishers never establishing that the TCE interfered with or injured their actual intended use of their property. As already stressed, the "entitlement to severance damages is for the court and only the amount thereof is for the jury . . . ." (*Id.* at p. 971.)

In *Metropolitan Water,* our Supreme Court discussed the property owner's attempt in an eminent domain action to recover permanent and temporary severance damages. (*Metropolitan Water, supra*, 41 Cal.4th 954.) The trial court in *Metropolitan Water* had excluded evidence related to the adverse impact of the water district's project to develop a water pipeline and the property owner's ability to use, develop, and market the property during the seven-year period of construction. (*Id.* at p. 974.) The trial court concluded that " '[t]he time period of construction may result in severance damages as to rental losses, for example, but not as to marketability.' " (*Ibid.*) The Court of Appeal disagreed and concluded that the trial court should have allowed the property owner to present evidence to show how the project as proposed interfered with its plans for developing the property, " 'especially in regards to obtaining financing and marketing the property.' " (*Ibid.*)

The Supreme Court granted review in *Metropolitan Water* and stressed that the property owner had not identified any intended use of the property during the relevant period; the property owner also had not identified any specific loss attributable to the delay in construction. (*Metropolitan Water, supra*, 41 Cal.4th at p. 975.) The Supreme Court agreed with the Court of Appeal that a property owner "generally should be able 'to present evidence to show whether and to what extent the delay disrupted its use of the remaining property.' " (*Ibid.*) However, the property owner in *Metropolitan Water* had failed to support the allegation of damages with any citation to the record and "the mere fact of a delay associated with construction of the pipeline did not, without more, entitle [the property owner] to temporary severance damages relating to the financing or marketing of the property in this eminent domain action." (*Ibid.*)

In its discussion of temporary severance damages in eminent domain actions, the Supreme Court in *Metropolitan Water, supra*, 41 Cal.4th at page 975, cited its earlier case, *City of Los Angeles v. Ricards* (1973) 10 Cal.3d 385 [110 Cal.Rptr. 489, 515 P.2d 585] (*Ricards*), and a Fourth Appellate District decision, *Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc.* (1978)

77 Cal.App.3d 742 [143 Cal.Rptr. 803] (*Sunny Crest Dairy*).[5] In *Ricards,* the city destroyed a private bridge over which the plaintiff held an easement and which constituted the sole legal access to her property; she remained without access until a bridge was constructed two years later. (*Ricards, supra,* at p. 387.) The superior court found that the property would not have been used or rented had the bridge remained intact, because it was being held for speculation and investment appreciation, "which was 'the highest and best use,' . . . and that 'there ha[d] been no showing that any interim use would

---

[5] In *Sunny Crest Dairy, supra,* 77 Cal.App.3d 742, the flood control district acquired both a permanent and temporary easement by eminent domain for the construction of an underground storm channel. (*Id.* at p. 749.) The defendant possessed the property under a long-term lease and used the property as a cash-and-carry dairy, which was a nonconforming use. (*Ibid.*) The defendant immediately terminated his cash-and-carry dairy operation as a result of the taking and began development of a mobilehome park on the site. (*Ibid.*) The defendant sought to recover rent for a two-year period where it was preparing to operate the property as a mobilehome park after cessation of the nonconforming dairy operation. (*Ibid.*)

In *Sunny Crest Dairy,* the reviewing court held that the defendant's attempt to recover the fair rental value as damages for a temporary taking of the remainder of the property constituted, in reality, an improper attempt to recover a business loss. (*Sunny Crest Dairy, supra,* 77 Cal.App.3d at pp. 762–764.) The appellate court observed that the defendant had presented no evidence of a physical taking of the remainder or its impairment of the remainder for any permissible use other than the cash-and-carry dairy operation. (*Id.* at p. 762.) Acknowledging some testimony that construction of a mobilehome park could not have commenced while the flood control district worked on the underground storm channel project, the court pointed out that there was no evidence that the defendant was ready to begin construction of the mobilehome park. (*Ibid.*) It concluded there was no factual basis for the recovery of damages on the theory of a temporary taking of the remainder. (*Ibid.*) The court determined that the defendant was already recovering market value and severance damages on the basis that the nonconforming use continued to the date of value and therefore allowing an additional recovery of the fair rental value of the property amounted to a double recovery of compensation for diminution in market value caused by the same use impairment. (*Ibid.*) Thus, the defendant was essentially seeking loss of income or a business loss, which is not permitted in an eminent domain action. (*Ibid.*) The court concluded: "Although just compensation requires payment of the fair market value of the property taken and severance damage to the remainder [citation], it does not require compensation for losses sustained by an owner such as lost business opportunities, expectations, or inconveniences [citations]." (*Id.* at p. 763.)

The Fishers argue that *Sunny Crest Dairy* has no application because it is concerned with a lost business opportunity, which is not at issue here. Fremont maintains that Reitman's TCE severance damage analysis was essentially a lost profits analysis. Although we need not consider *Sunny Crest Dairy* because the Supreme Court's holdings in *Metropolitan Water* and *Ricards* are directly applicable, we note that *Sunny Crest Dairy* bolsters Fremont's argument that the Fishers must identify a specific loss attributable to the TCE. Moreover, the reasoning of *Sunny Crest Dairy* is not limited in the manner urged by the Fishers; the court in *Sunny Crest Dairy* concluded *there was no factual basis* for the recovery of damages on the theory of a temporary taking of the remainder because the defendant failed to prove construction of the mobilehome was to begin at the time of the temporary taking. (*Sunny Crest Dairy, supra,* 77 Cal.App.3d at p. 762.) Accordingly, the court rejected an award of temporary severance damages because of the defendant's failure to show any actual injury to the use of the property. Similarly, here, the Fishers failed to establish that the TCE resulted in any actual injury to their use of the property.

have been made of the subject property if construction or damage had not occurred.' " (*Id.* at p. 388.) Despite these findings, the superior court awarded the owner the value of the property with access unimpaired multiplied by the legal rate of interest for two years. (*Ibid.*)

The Supreme Court in *Ricards* reversed the award of temporary severance damages. (*Ricards, supra,* 10 Cal.3d at p. 389.) It held that the plaintiff had suffered no loss because the value of the property would be just as high after the bridge was constructed and there was no showing that any interim use would have been made of the property in the two years during which access was denied. (*Id.* at p. 389.) The Supreme Court determined that the easement did not prevent the plaintiff from selling the property; she could have sold the property at a lesser price during the period access was denied and then sought to recover from the city the amount by which the selling price was reduced because of the impairment of access. (*Ibid.*)

Similarly to *Metropolitan Water* and *Ricards,* there is no evidence in this record that the Fishers intended to sell or to develop their property during the period that their property was encumbered by the TCE. Without such evidence, the TCE caused no actual injury to the Fishers.

Rather than being presented with evidence of the Fishers' actual intended use of the property, the trial court heard evidence regarding a hypothetical use of the property. The court heard evidence that the Fishers would not be able to sell their property for its maximum value if they wished to sell it and they could not develop it during the five-year period of the TCE had they wished to raze their home and build a larger one. The transcript from the hearing on the motions in limine makes it clear that the lower court mistakenly believed that evidence the TCE would impair a hypothetical or possible use of the property was sufficient to show an entitlement to temporary severance damages. At this hearing, counsel for the Fishers argued that it did not really matter what the Fishers' actual intention was and the only relevant information was whether the property was worth less money during the time the TCE existed. Counsel elaborated: "What we expect here is it's possible that the City's interference by the temporary construction easement has inhibited the ability of the Fishers to sell their property at perhaps the highest value it will ever be. We don't know. [¶] . . . [¶] But that's not what we're talking about. What we're talking about is the inability of the Fishers to deal with their property, to sell it. You know, the dream of everybody my age—many people my age is that you sell your greatly appreciated property and you take some of that money and you put it in a place that costs less that's somewhere else and you bank the rest, and that is essentially what the Fishers have been deprived of."

The trial court asked the attorney for the Fishers how the court knows that the Fishers intended to sell the property. Counsel for the Fishers responded: "Well, we are not required to know what they're going to do. The appraiser just simply looks at it and says what are the realities. [¶] But the fact of the matter is the opinion of this appraiser is that they can't sell the property for anywhere near full value while this temporary construction easement is in place." The court asked: "So the intentions or the personal desires of the owner are irrelevant." Counsel answered: "They don't mean a lot when you're making valuation judgments here." The court concluded: "I see. I just wanted to make that clear in my mind."

Subsequently, the trial court conducted a hearing pursuant to Evidence Code section 402 to hear from the appraiser and to determine whether "his analysis is sufficiently sound to go forward." Thus, the court's only consideration at the Evidence Code section 402 hearing was Reitman's methodology. However, the court should not have permitted Reitman to testify at trial about his method for calculating temporary severance damages because the Fishers had failed to establish they were entitled to temporary severance damages. The Fishers had presented no evidence to the trial court that the TCE interfered with their actual intended—not hypothetical—use of the property.

The evidence at the hearing pursuant to Evidence Code section 402 again established that Reitman's calculations of temporary severance damages were not based on information garnered regarding the Fishers' actual intended use of the property. Although Reitman's analysis of damages was predicated on the Fishers not being able to sell their property for its optimal value or to develop their property during the five-year period of the TCE, Reitman disclosed that he had no information indicating that the Fishers either wanted to sell or develop their property. Reitman responded as follows to questions posed by counsel for Fremont:

"Q. Now, you haven't seen any plans to develop anything on the property, correct?

"A. That is correct.

"Q. You have had no discussion with the owner regarding any new development of the property, correct?

"A. Correct.

"Q. And, in fact, you have no reason to believe that there are any plans—that any plans for redevelopment exist or have ever existed?

"A. That is correct.

"Q. And you also would agree that the owners have not actually attempted to sell and market the land?

"The court: I couldn't hear that. Say that again.

"Q. It is your understanding that the owners have not attempted to sell or market the land; is that correct?

"A. It is my understanding that they were at one time considering selling the property but I have no actual documentation to that effect.

"Q. Well, they never listed the property, correct?

"A. Not to my knowledge."

The trial court's ruling at the end of the hearing was as follows: "The court finds that on a more-likely-than-not basis there is a substantial impairment to the remainder of the defendants' property. [¶] Mr. Reitman's testimony is credible when he opines that the property when encumbered by the temporary construction easement could only be sold at a deep discount. [¶] As to the evaluation of the impairment to the remainder, the court finds that the methodology used by Mr. Reitman is basically sound and is admissible for the jury to consider and evaluate." The trial court, however, had to find there was a substantial impairment to the actual intended use of the Fishers' property, not a substantial impairment to a hypothetical use. The court heard no evidence supporting a finding that the TCE caused actual injury and therefore Reitman's testimony on valuation was inadmissible.

At trial, too, no evidence was presented that the Fishers intended to sell or develop the property. The Fishers did not testify, and the only relevant exchange was the following one between Fremont's attorney and Reitman:

"Q. And I just want to make sure I understand what we're—what you're doing here. The temporary construction easement severance damage, that's really something like a loss of maximum revenue realization for the owners; is that right?

"A. That is correct.

"Q. And what you're saying is that it reflects a return that an owner could have gotten but is not getting because of an inability to develop the property?

"A. That is correct.

"Q. Okay. In order to earn this, the owner—or the property would have to be sold, the home would have to be demolished, and then the—and then the new home would have to be built, and then it would have to be resold, right?

"A. That is correct.

"Q. Now, you haven't seen any plans to do any development on this property, correct?

"A. No, I have not.

"Q. You haven't had any discussion with the owner regarding the development of this property?

"A. No, I have not.

"Q. And you have no reason to believe that there are any plans for this redevelopment that exists or have ever existed?

"A. I have had no conversation or indication to that effect.

"Q. As far as you know, the owners have not attempted to sell or market the land?

"A. That is my understanding.

"Q. And the property has not been listed for sale since the temporary construction easement took effect?

"A. This is correct.

"Q. And as far as you understand, there hasn't been any construction in the temporary construction easement area yet?

"A. That is correct."

As already stressed, the Fishers did not identify any specific or actual loss attributable to the TCE and presented no evidence that the TCE interfered in any way with their actual intended use of the property. They presented no evidence that they had attempted or were attempting to sell the property during the time of the TCE or that they had any plans to tear down their home and develop the property. Since there was no evidence of actual injury,

the lower court abused its discretion in permitting the jury to consider compensation for a hypothetical injury.

 The Fishers argue that the Supreme Court in *Metropolitan Water* held that "once the court finds that the taking has substantially impaired the property owner's right of access—it is for the jury to determine the effect of the impairment, if any, on the property's market value." (*Metropolitan Water, supra,* 41 Cal.4th at p. 973.) Here, the Fishers maintain the lower court did find that the TCE substantially impaired the property's market value and therefore the jury properly considered the amount of compensation for this impairment. The passage from *Metropolitan Water* quoted by the Fishers, however, refers to permanent severance damages, not temporary severance damages. In its subsequent discussion regarding temporary severance damages, the Supreme Court in *Metropolitan Water* makes clear that the property owner must establish a substantial impairment to the property owner's *actual intended* use of the property during the period of the temporary encumbrance. (*Id.* at p. 975.) Otherwise, there is no specific loss attributable to the temporary encumbrance. (*Ibid.*)

The Supreme Court's holding in *Metropolitan Water,* which requires the defendant to establish that a temporary taking interferes with the property owner's actual intended use of the property, is underscored in its discussion of *Placer County Water Agency v. Hofman, supra,* 165 Cal.App.3d 890. (*Metropolitan Water, supra,* 41 Cal.4th at p. 975.) The Supreme Court in *Metropolitan Water* noted that the defendant in the case before it was relying on *Hofman* when arguing entitlement to temporary severance damages, despite *Hofman*'s providing "scant support" for the defendant's position. (*Metropolitan Water, supra,* at p. 975.) The defendant in *Metropolitan Water* produced no evidence of any impairment to the actual intended use of the property. (*Ibid.*) In contrast, the defendant in *Hofman* established that the temporary easement " 'substantially prevented use of the property for cattle and sheep ranching,' " and cattle and sheep ranching was the property's actual use. (*Metropolitan Water, supra,* at p. 975.) Thus, temporary severance damages were properly awarded in *Hofman* because there the temporary taking substantially interfered with the property owner's use of the property while such damages were not appropriate in *Metropolitan Water* unless the defendant upon remand could also produce some evidence of an actual injury from the temporary taking.

The Fishers also attempt to distinguish the facts of the present case from the facts in *Metropolitan Water, supra,* 41 Cal.4th 954. They contend that, unlike the property owner in *Metropolitan Water,* they presented evidence of the intended use of their property and they identified the specific loss attributable to the delay in construction. They claim that the intended and

actual use of their property was that of a single-family home and the specific loss was the diminution in value to the remainder parcel due to the five-year construction easement encumbering their property. They, however, completely failed to identify any *actual* loss attributable to the delay caused by the TCE because they produced no evidence that they tried to or planned to sell the property during the five years the property was burdened by the TCE. They produced no evidence that the TCE interfered with their actual use of their current single-family home.

The Fishers cite a number of cases and, with little analysis, they claim these cases support their award of temporary severance damages. (See *City of Needles v. Griswold* (1992) 6 Cal.App.4th 1881, 1888 [8 Cal.Rptr.2d 753] [" ' "[T]emporary" takings which . . . deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation.' "]; *Sacramento & San Joaquin Drainage Dist. v. Goehring* (1970) 13 Cal.App.3d 58, 66 [91 Cal.Rptr. 375] [a temporary taking or easement requires compensation]; *Harding v. State of California ex rel. Dept. of Transportation* (1984) 159 Cal.App.3d 359, 366 [205 Cal.Rptr. 561] [plaintiffs should be allowed to prove permanent injury resulting from the proximity of their property to the highway]; *Jones v. People ex rel. Dept. of Transportation* (1978) 22 Cal.3d 144, 154 [148 Cal.Rptr. 640, 583 P.2d 165] [government's action was a taking because the proposed freeway substantially and permanently interfered with access to the plaintiff's land and prevented planned subdivision].) These cases, however, do not establish that the Fishers are entitled to temporary severance damages. These cases either are inapplicable because they involve permanent severance damages or, if applicable, merely stand for the principle that a temporary taking or easement requires just compensation. Thus, for example, in *City of Needles,* the court held that a taking had occurred when the city, following the termination of a license agreement under which the defendants operated a golf course owned by the city, obtained an injunction that gave it possession of personal property belonging to the defendants. (*City of Needles v. Griswold, supra,* at p. 1886.) Contrary to the *City of Needles,* the case before us does not concern the taking of personal property. Moreover, *City of Needles* simply states the general principle that a temporary taking, similarly to a permanent taking, requires just compensation. (*Id.* at p. 1888.)

■ We therefore conclude the trial court in the present case improperly permitted the jury to determine compensation when the Fishers failed to show they were entitled to temporary severance damages. The court abused its discretion in finding there was a substantial impairment to the Fishers' actual intended use of the property when the only evidence presented was that the TCE substantially impaired a hypothetical use of the Fishers' property. As

already emphasized, the court in *Metropolitan Water* held that, when considering temporary severance damages, "the mere fact of a delay associated with construction of [an easement does] not, without more, entitle [the property owner] to temporary severance damages relating to the financing or marketing of the property in [an] eminent domain action." (*Metropolitan Water, supra,* 41 Cal.4th at p. 975.) Here, the Fishers presented evidence that they could not sell their property at its optimal price or replace their current home with a larger home during the period the TCE burdened their property, but the record contains no evidence that the Fishers had any plan to—or had attempted to—sell or develop their property during this five-year period.

Accordingly, we conclude that the trial court abused its discretion when it permitted the Fishers to present evidence to the jury on temporary severance damages from the TCE because the Fishers failed to meet their burden of producing evidence that the TCE substantially interfered with or impaired their actual intended use of the property.[6]

## II. *Litigation Expenses*

Fremont argues the trial court abused its discretion in awarding litigation expenses to the Fishers pursuant to section 1250.410. Section 1250.410, subdivision (b) authorizes the trial court to award litigation expenses to the defendant in an eminent domain proceeding if it determines that the final pretrial "offer of the plaintiff was unreasonable and that the demand of the defendant was reasonable viewed in the light of the evidence admitted and the compensation awarded in the proceeding."

The factors the statute required the trial court to consider and the factors the trial court did consider in awarding litigation expenses to the Fishers were derived from the jury award. We, however, are reversing the award of temporary severance damages, which comprised almost one-half of the amount awarded by the jury. Thus, the basis for the court's awarding litigation expenses has now been significantly modified. Accordingly, we remand for the trial court to reconsider any award of litigation expenses under section 1250.410 in light of our reversal of a significant portion of the judgment.

## DISPOSITION

The judgment is affirmed in part and reversed in part. We reverse the part of the judgment awarding the Fishers $195,413 for temporary severance

---

[6] The Fishers argue that substantial evidence supported the verdict. We, however, are not concerned with evidence in support of Reitman's measurement of the temporary severance damages because we are holding that the Fishers were not entitled to temporary severance damages.

damages from the TCE. We also reverse the part of the judgment awarding litigation expenses and remand to the superior court for reconsideration consistent with the views expressed in this opinion. The judgment is otherwise affirmed. The Fishers are to pay the costs of appeal.

Haerle, Acting P. J., and Richman, J., concurred.

A petition for a rehearing was denied March 18, 2008, and respondents' petition for review by the Supreme Court was denied May 21, 2008, S162473.